**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF NORTH CAROLINA**

ALBERT LEE ANDREWS, III,      )
                              )
            Petitioner,       )
                              )
        v.                    )        1:12CR117-1
                              )        1:16CV565
UNITED STATES OF AMERICA,     )
                              )
            Respondent.       )


**MEMORANDUM OPINION AND RECOMMENDATION**
**OF UNITED STATES MAGISTRATE JUDGE**

This case comes before the undersigned United States Magistrate Judge for a recommended ruling on Petitioner's Motion under 28 U.S.C. § 2255 to Vacate, Set Aside, or Correct Sentence ("Section 2255 Motion") (Docket Entry 110; see also Docket Entry 111 (Memorandum)) and two Motions to Amend (Docket Entry 120 ("First Motion to Amend"); Docket Entry 128 ("Second Motion to Amend")).[1] The Court should deny relief on the instant Motions.

INTRODUCTION[2]

This case began when a grand jury for this District indicted Petitioner (in Count One of the Indictment) for interfering with commerce by robbery of a pizza business in Kannapolis, North

_____

[1] Parenthetical cites refer to Petitioner's criminal case.

[2] Fair evaluation of Petitioner's instant Motions requires the placement of his allegations therein within the full context of his conduct during the (lengthy) course of the proceedings in this case, which requires the (lengthy) discourse which follows above.

Carolina, on March 26-27, 2011, in violation of 18 U.S.C. § 1951(a) ("Hobbs Act robbery"), and (in Count Two of the Indictment) for carrying and using by brandishing a firearm during and in relation to that interference with commerce, in violation of 18 U.S.C. § 924(c)(1)(A)(ii) ("Section 924(c)"). (See Docket Entry 1 at 1-3.) The Court (per United States Magistrate Judge Joi E. Peake) appointed John A. Dusenbury, Jr. to represent Petitioner. (See Docket Entry 4.) The Scheduling Order for this case, issued to Petitioner on April 12, 2012, at the time of his arraignment (see Minute Entry dated Apr. 12, 2012 (documenting arraignment); Docket Entry 6 at 1 (reflecting Scheduling Order docketing date in footer)), mandated that (A) "[p]lea agreements, if any, shall be filed . . . not later than 12:00 noon, May 3, 2012" (Docket Entry 6 at 1 (bold font omitted)), and (B) "[Petitioner wa]s ordered to appear for jury trial at 9:30 a.m., May 14, 2012, . . . unless otherwise ordered by the Court" (id. (bold font omitted)). At a status conference (with counsel) a week before that trial date, the Court (per United States District Judge William L. Osteen, Jr.) re-set the trial for May 29, 2012, but noted that "[t]his case will be called for trial on [May ]21[, ]2012 if the case currently set for that date should be resolved." (Minute Entry dated May 7, 2012.)

2

Two days after that status conference, Mr. Dusenbury moved to withdraw as Petitioner's counsel. (See Docket Entry 9 ("First Withdrawal Motion").) In the First Withdrawal Motion, Mr. Dusenbury gave this summary of his representation of Petitioner:

> I met with [Petitioner] prior to his arraignment on April 12, 2012, and represented him during the ensuing arraignment and detention hearing. I also met with him for approximately 1-1/2 hours immediately after his detention hearing. During these meetings, I discussed with [Petitioner] in detail the nature of the charges against him, the elements of the offenses with which he had been charged and the applicable statutory penalties. During four subsequent meetings, I reviewed the Government's discovery with [him] and explained his potential sentencing guideline range. I also researched possible defenses and discussed the results of that research at length with [Petitioner]. I engaged in plea negotiations with counsel for the Government and discussed the results of those conversations with [him]. I also counseled with [him] regarding the relevant merits of going to trial versus entering a negotiated guilty plea and, with regard to the trial option, the relative merits of a jury trial versus a bench trial.
>
> Following my meeting with [Petitioner] on May 8, 2012, [he] informed me that he wished to have another attorney appointed to his case.

(Id. at 1-2 (internal paragraph numbers omitted); see also id. at 2 ("Despite my best efforts to counsel and represent [Petitioner], [he] does not believe that [I] will provide effective representation. . . . [I]n accordance with [his] request, [I] move[] to withdraw as counsel of record.").)

3

The following Monday, Judge Osteen held another status conference (with counsel and Petitioner). (See Docket Entry 151; Minute Entry dated May 14, 2012.) At the start of that conference, Mr. Dusensbury elaborated on the First Withdrawal Motion's genesis:

> [Petitioner] expressed to me some concerns about whether I . . . had some sort of conflict of interest . . . based on a statement that I was supposed to have been heard making just prior to his detention hearing in Winston-Salem. Apparently, some other inmates who were in the courtroom before [Petitioner] told him that in conversations either with the prosecutor . . . or the [federal] agent who was to testify at that hearing, I made a statement indicating that [Petitioner] was probably guilty . . . . Based on that and . . . other areas of dissatisfaction, he's asked me to file th[e First Withdrawal M]otion, so at his request I've done so.

(Docket Entry 151 at 2-3.)

Mr. Dusenbury nonetheless reported (in answer to further inquiry from the bench) that he felt "perfectly content to remain in the case" (id. at 3), as well as that, even "if [the parties] needed to try the case th[at] week, [he would] be ready to try it" (id.), although Mr. Dusenbury expressed concern about whether "[Petitioner] ha[d] told [Mr. Dusenbury] everything that [Petitioner] kn[ew] about the situation, specifically as it relate[d] to a possible defense that [they] had a discussion about" (id.). Judge Osteen then afforded Petitioner a chance to

4

speak (see id. at 3-4), which he took, stating (in pertinent part) that:

1) "[Petitioner had] been allowed to look over [his discovery] a total of 45 minutes" (id. at 4; see also id. ("I mean, my discovery is like 240 pages."); but see id. at 6 ("MR. DUSENBURY: . . . [Petitioner] and I have spent, by my calculation, no less than six hours reviewing the discovery in his case." (bold font omitted)), 7-8 (memorializing Mr. Dusenbury's detailed account (A) of time spent with Petitioner discussing his case over several weeks, including "[n]ot [just] discovery, but [also] testimony," (B) of roughly six hours spent reviewing discovery "with [Petitioner] on three consecutive days" from May 1-3 "and then [again on] Saturday the 5th," and (C) of Petitioner, "at the end of that [time], . . . indicat[ing] to [Mr. Dusenbury] that [Petitioner] had seen the discovery to his satisfaction"));

2) "[Petitioner and Mr. Dusenbury] hadn't even talked about a defense" (id. at 5; see also id. at 5-6 ("May 8 when he came and told me about going to trial, I asked him, well, how do we go to trial? . . . We haven't subpoenaed anybody or talked about a defense at that time. . . . How do you try a case when you never went over the defense with your client?"), 8 ("THE COURT: . . . [Y]ou haven't given him the name of your

5

witnesses, [Petitioner]?  . . . [Petitioner]:  We've never been over it. . . .  We've never talked anything about a defense." (bold font omitted)), 17-18 (deflecting Judge Osteen's (A) warning that, "if you've got some defenses out there that you're holding back for some reason, then you're not going to get good advice," and (B) expression of unease about whether "[Petitioner] ha[d] disclosed to Mr. Dusenbury everything Mr. Dusenbury might need to know to effectively defend [Petitioner]," by remarking:  "We haven't had time, Your Honor."));

3) "[Petitioner had] never seen a plea in writing" (id. at 5; see also id. ("THE COURT:  So what's the plea that you advised him you were willing to agree to?  [Petitioner]:  He asked -- we talked about if I would plead to a gun -- to the Hobbs Act robbery charge and try to get the gun dismissed. That's what we talked about." (bold font omitted)));

4) "[Petitioner] never knew about a trial until May 8, so [he] had no time to try to give the [prosecutor] notice of anything or go over anything" (id.);

5) "at [Petitioner's] detention hearing" (id. at 6), he heard from "four inmates along with a lady that was there to see her son" (id.) that, after a federal agent "made a statement saying [that] they felt like [Petitioner] could have been guilty

6

for another robbery, but they couldn't prove it" (id.), and that
they "'ha[d] him now'" (id.), Mr. Dusenbury "shook hands with
th[at ] agent and said 'justice is served'" (id.; see also id.
at 11 ("Mr. Dusenbury told me he had a conversation with th[e
federal] agent.  He just didn't remember saying those exact
words, 'justice is served.'"));

6) "[Petitioner] d[id]n't see where Mr. Dusenbury [wa]s
really putting forth the effort to really help [Petitioner] in
[his] case or really even try [his] case" (id. at 6);

7) "[w]hen [Petitioner and Mr. Dusenbury] were having
discussions about going to trial and everything, the
conversation got heated, and Mr. Dusenbury ma[de] a statement
saying 'You know what you did, you just need to man up and own
up to it'" (id. at 9; but see id. ("MR. DUSENBURY:  Your Honor,
I'll just say that never happened.  That's just a fabrication."
(bold font omitted))); and

8) "[Petitioner was] fully aware of what [he was] facing and
how much time [he was] looking at" (id. at 16; see also id.
("That has nothing to do with why I asked [Mr. Dusenbury] to
remove himself from counsel. . . .  It has nothing to do with
the plea [the prosecutor] has offered or he's -- where he stated
[the prosecutor] had.  This is simply between me and [Mr.
Dusenbury] and actions and things that have taken place.")).

7

After hearing fully from all concerned, Judge Osteen "den[ied] the [First Withdrawal M]otion, . . . on the condition that [Mr. Dusenbury] meet with [Petitioner] before the close of [the ]day." (Id. at 19; see also id. ("[T]ry to figure out today, Mr. Dusenbury, if there's going to be some notice of alibi given. . . . I'll give you until tomorrow at 5:00 to get that notice in."); Minute Entry dated May 14, 2012 (documenting that Judge Osteen (A) directed Petitioner and Mr. Dusenbury "to meet by 5:00 PM to discuss case" and (B) confirmed case would "continue to trial as currently scheduled").)[3] Two days later, Mr. Dusenbury renewed his withdrawal request. (See Docket Entry 12 ("Second Withdrawal Motion").) In the Second Withdrawal

---

[3] In route to that result, Judge Osteen discounted Petitioner's hearsay report about Mr. Dusenbury's purported "justice is served" remark to a federal agent at Petitioner's detention hearing. (See Docket Entry 151 at 9-10 (observing that "[said purported remark] doesn't make any sense in the context of a detention hearing, and [that], . . . as a private practitioner or as a judge, [Judge Osteen] never heard Mr. Dusenbury say anything that approached that"), 12 ("[Mr. Dusenbury] may have said something like that, he may have said something similar to that, but context is everything. . . . So again, 'justice is served' . . . -- I can't construe any situation where that would be something that Mr. Dusenbury would [have] said.").) Judge Osteen also took note of Mr. Dusenbury's lengthy record of honorable service in this District. (See id. at 18-19 ("THE COURT: . . . How long have you been practicing criminal law, Mr. Dusenbury? MR. DUSENBURY: Since '81. THE COURT: Federal Public Defender since when? MR. DUSENBURY: '92. THE COURT: All right. [Petitioner], you've got a lawyer who's got a lot of experience in [f]ederal [c]ourt. . . . Mr. Dusenbury has been around a long time and handled a lot of cases." (bold font omitted)).)

Motion, Mr. Dusenbury referenced Judge Osteen's instructions at the status conference two days earlier and summarized subsequent events:

> During the status conference on May 14, 2012, . . . the Court directed [me] to meet with [Petitioner] . . . at the conclusion of the conference. The Court also directed [Petitioner] to disclose to [me] the identity and contact information for any potential alibi witnesses. The Court told [me] that, if an alibi defense was to be used, notice thereof . . . was to be filed by 5:00 PM on Tuesday, May 15, 2012. At the conclusion of the conference, the Court set the trial in this case to begin Tuesday, May 29, 2012.
>
> [I] met with [Petitioner] in the Office of the United States Marshal following the status conference for more than one hour. [I] also met with [Petitioner] at the Alamance County Jail in Graham, NC, for approximately 1-1/2 hours during the evening of May 15, 2012. <u>During these meetings, [Petitioner] disclosed to [me] the identity of a potential alibi witness. [Petitioner] however did not recall the contact information for the individual. Attempts to reach the potential witness through third parties identified by [Petitioner] were unsuccessful.</u> Consequently, the individual named by [Petitioner] as a potential alibi witness could not be contacted prior to 5:00 PM on May 15, 2012. No notice of alibi could therefore be filed on [Petitioner's] behalf within the time frame fixed by the Court.
>
> [I] also learned, on Tuesday, May 15, 2012, that the starting date for the trial in this case had been moved forward from May 29, 2012, until May 21, 2012. [I] informed [Petitioner] of the inability to locate the potential alibi witness and of the change in the date that the trial in this case was to begin. The ensuing exchange between [us] leads [me] to conclude that . . . lines of communication between [us] have now been impaired to the point where [Petitioner] is unwilling to accept advice and counsel from [me]. [I am] of the belief that <u>[Petitioner] has and will continue to make strategic decisions in his case,</u> that

9

will ultimately inure to his detriment, <u>to spite [me]</u>. The degradation of the lines of communication between [us] since the status conference on May 14th has reached the point where [my] ability . . . to effectively represent [Petitioner] has been irreparably compromised.

(<u>Id.</u> at 1-3 (internal paragraph numbers omitted) (emphasis added).)

The next day, the Court (per Judge Osteen) held a Pretrial Conference, granted the Second Withdrawal Motion, ordered the appointment of substitute counsel, and "continued [the trial] to the July 2012 Criminal Term of Court[ with intervening] Speedy Trial [Act] time . . . excluded." (Minute Entry dated May 17, 2012; <u>see also</u> Docket Entry 13 at 1 (appointing Robert L. McClellan as Petitioner's counsel).) The written order memorializing those rulings recited that Petitioner "assert[ed that] various matters requir[ed] investigation by his counsel, including a potential <u>alibi witness</u> . . . ." (Docket Entry 14 at 1 (emphasis added).)

In advance of the new trial date, Petitioner (through Mr. McClellan) "<u>assert[ed] a defense of alibi</u> . . . and [as support Petitioner ] stated that on the night of March 26, 2011 and the morning of March 27, 2011, [he] was in the presence of Monica Moffett . . . and Jerrika Hunter . . . from approximately 8:00 p.m. that evening until approximately 7:00 a.m. the next morning." (Docket Entry 27 at 1 (emphasis added); <u>accord</u> Docket

10

Entry 28 at 5.) Additionally, Petitioner made a number of pro se filings (see Docket Entries 29-32, 37-40), in which (among other things) he (A) "move[d] this Court to dismiss [the I]ndictment . . . for the reasons that the prosecutor should be limited in the number of felonies he is allowed to commit in order to obtain a conviction" (Docket Entry 31 at 1), (B) alleged that "[o]n three different occasions the prosecutor ha[d] attempted to intimidate possible witnesses[] and obstruct justice" (Docket Entry 32 at 1; see also id. (identifying "Ms. Hunter" as one of witnesses "[f]ederal [a]gents threaten[ed]")), (C) emphasized Petitioner's "protected right to a jury trial" (id. at 2), (D) alluded to the United States instituting "[a] bad faith prosecution" (id.), and (E) "move[d] the Court to dismiss Count 2 of [the I]ndictment . . . for the reason that the prosecution ha[d] no physical evidence to prove [the] allegation charged in Count 2" (Docket Entry 37 at 1; see also Docket Entry 38 at 1 ("[T]he prosecutor has no evidence what-so-ever to prove Count 2 of [the I]ndictment.")).[4]

The case proceeded to trial. (See Minute Entries dated Aug. 6-8, 2012; Docket Entries 58-60, 78.) The evidence from the

---

[4] Judge Tilley "w[ould] not consider [those m]otions [as Petitioner] ha[d] representation[ by Mr.] McClellan." (Third Minute Entry dated Aug. 6, 2012; accord Docket Entry 58 at 4, 48.)

11

United States showed that the offenses charged in the Indictment occurred during a roughly one-hour period before to slightly after midnight on March 26-27, 2011. (See, e.g., Docket Entry 58 at 84-86, 90-92, 125, 128; Docket Entry 59 at 42-44, 67-69.) After the United States rested (see Docket Entry 59 at 165), Petitioner presented testimony from his two alibi witnesses (see id. at 168-96). In particular, Ms. Hunter testified that, on "the night of March 26, 2011" (id. at 169) – a date she remembered "[b]ecause it was [her] aunt's birthday" (id.) – Petitioner arrived at the home in Charlotte, North Carolina, which Ms. Hunter shared with her mother and sister (see id. at 168-69), "[b]etween 8:00 and 8:30 [P.M.]" (id. at 170), after which Ms. Hunter, her mother, her sister, and Petitioner "sat in the living room" (id. at 172), for a period of "[h]ours" (id.), during which they "[w]atched TV, talked, [and] chill[ed]" (id.; see also id. ("Maybe had a drink or two.")), until first her mother went to bed around "[m]aybe 12:00" (id. at 176), and then later Ms. Hunter and Petitioner went to her bedroom (see id. at 173), where they stayed "[u]ntil the next morning" (id. at 174), when he left after sun-up (see id.; see also id. at 176 ("Q How late did you and [Petitioner] stay up that night? A Maybe 2:00, 3:00 in the morning. Q Do you recall him ever leaving the bedroom until daylight the next morning? A No, sir.")).

12

Ms. Moffett – Ms. Hunter's mother (see id. at 186) – similarly testified that, on March 26, 2011, Petitioner arrived at her home "[l]ate that evening" (id. at 187; see also id. at 189 ("It was about 8:00 or 8:30 . . . .")), after which "[they] had a few drinks" (id. at 189), before she went to her room and "got ready for bed" (id.), at "[a]bout 1:00 [a.m.]" (id.).

The jury thereafter found Petitioner guilty of both Counts One and Two (expressly finding, as to the latter, that he brandished a firearm). (See Docket Entry 44 at 1; Docket Entry 60 at 6-9; see also Docket Entry 78 at 43 (instructing jury that Petitioner's guilt on Count Two required, as first element, proof "that he committed a [Hobbs Act] robbery").) Subsequently, on September 12, 2012, the United States Probation Office issued a Presentence Investigation Report ("PSR") (see Docket Entry 117 at 1), which included findings that "[Petitioner] . . . ha[d] at least two prior felony convictions of [] a crime of violence . . . [and] therefore[ wa]s a career offender" (id. at 6 (citing multiple prior convictions for robbery with a dangerous weapon and assault with a deadly weapon with intent to kill); see also id. at 5 (denoting application of "2011 Guidelines Manual"), 7-9 (documenting Petitioner's prior convictions for five robberies with a dangerous weapon and two assaults with a deadly weapon with intent to kill, all

13

consolidated for judgment but with multiple intervening arrests), 10 (explaining that Petitioner's "criminal history score of eight establishe[d] a criminal history category of IV," but that, "[a]s a career offender . . ., [his] criminal history category [wa]s VI")). "[A]s [Petitioner wa]s a career offender who [wa]s also convicted of [a Section] 924(c) [offense] . . ., [the PSR calculated his] guideline range [as] 360 months to life." (Id. at 16 (citing U.S.S.G. §§ 4B1.1(c)(3) and 5G1.2(e)).)

The PSR also reported that, "[a]s of completion of the presentence investigation, [Petitioner] ha[d] not clearly demonstrated acceptance of responsibility for [his] offense[s]." (Id. at 6.) Moreover, per an Addendum to the PSR dated October 1, 2012, "[Mr.] McClellan, on behalf of [Petitioner,] filed objections to the [PSR]. The following objection remain[ed] unresolved: . . . [Petitioner] denies being involved in the instant offense[s] and disagrees with the facts set out in the offense conduct section of the [PSR]." (Id. at 20 (emphasis added).)

Around that same time, Petitioner resumed making pro se filings (despite his representation by Mr. McClellan). (See Docket Entries 47-49, 53-57; see also Docket Entry 50 at 1 (confirming, in motion filed by Mr. McClellan, that

14

"[Petitioner] persists in his plea of being Not Guilty").)
Those filings included a "Motion for Redress due to Ineffective
Assistance of Counsel" (Docket Entry 48 at 1),[5] which "states
that [Petitioner] would have never went [sic] to trial if [Mr.
Dusenbury and Mr. McClellan] would not have erroneously informed
[Petitioner] concerning plea negotiations" (id.; see also id. at
1-2 (describing alleged erroneous information as "mislead[ing
him] into believing that he would recieve [sic] no less than a
30 year term of imprisonment with the acceptance of the
Government's plea offer," "fail[ing] to inform [him] that the
Government's offer of a plea was still viable up to the day of
trial," "mislead[ing him] into believing that trial was the best
course of action," "mislead[ing him] into believing that he
would automatically be enhanced as a career offender and would
be sentenced as such irregardless of whether [he] plead or not,"
and "misunderst[anding] the nature of the Government's offer of
a plea agreement and fail[ing] to advise [him] properly,"
because "[counsel] had no knowledge of the Government's offer,"
which supposedly provided for only "seven years" in prison);
Docket Entry 55 at 1 (moving for new trial, inter alia, due to
"[i]neffective assistance of counsel before, during, and even

_____

    [5] This document (and others cited hereinafter) feature (at
times) all-capital letter text, but quotations thereto will
apply standard capitalization conventions for ease of reading.

after trial"); Docket Entry 56 at 1-2 ("Counsel's admitted statement of not ever seeing a plea agreement directly shows his ineffectiveness. At no time did [Petitioner's] attorney ever try and negotiate a plea for [Petitioner]. Also the attorney offered [Petitioner] a plea deal contrary to the one offered by first attorney. By offering [Petitioner] a more sever [sic] plea agreement, counsel forced [Petitioner] in a no win situation."); Docket Entry 57 at 2 (declaring in letter: "My lawyer's most ineffective representation of my case came when he admitted to me while discussing my [PSR] that he had never seen my plea agreement. He stated that he was offering me a plea based on what he thought they were willing to agree to. Not once did he ever see a plea in writing so he had never even negotiated a plea deal on my behalf.")).

At a status conference on October 25, 2012, the Court (per Judge Tilley) brought up Petitioner's (above-cited) pro se filings (see Docket Entry 150 at 2) and offered to "hear [from him] on th[em]" (id. at 3). Petitioner responded by first mentioning "Brandi Lark" (id.), a witness called at trial (see Docket Entry 59 at 80-101), and claiming to have "informed [Mr. McClellan] of conversations [Petitioner] had with [Ms. Lark] over the course of phone calls, and then letters that she wrote about why she testified and things that she said was [sic] lies"

16

(Docket Entry 150 at 3). Second, Petitioner complained "that [he had] asked [Mr. McClellan] to provide . . . expert witnesses to go against the identification used against [him]." (Id.; see also id. ("I asked for expert witness, because identification made of someone that supposed to be covered with a mask over bottom half of face and hat [sic]. It was to help me to establish that the person shouldn't have been able to identify me.").) Third (and last), Petitioner asserted that an investigator "lied about several factors that [Petitioner] can prove where [the investigator] got his information from, how he used the information and that [it] was all taken from attorney/client privilege[d] documents that [Petitioner] had given to [his] lawyer . . . ." (Id. at 4; see also id. ("THE COURT: . . . What is your next ground? [Petitioner]: Those were all three of them." (bold font omitted))).)[6]

---

[6] Petitioner's letter to the Court (like other of his pro se filings) similarly objected to purported perjury by an investigator about supposed misuse of attorney-client privileged materials, as well as Mr. McClellan's failure to act on Petitioner's reports about Ms. Lark and his request for expert testimony about identification. (Docket Entry 57 at 1-3; see also Docket Entry 53 at 1 (moving for "dismiss[al of] the charges/Indictment" because "information used to prosecute [Petitioner] were [sic] illegally obtained by [f]ederal [a]gent"); Docket Entry 55 at 1 (seeking new trial due to, inter alia, "[i]mproperly obtained evidence [] used at first trial" and "perjured testimony by one of prosecutions [sic] star witnesses"); Docket Entry 56 at 1 ("The federal [a]gents taking and use of [Petitioner's attorney-client privileged] papers
                                                      (continued...)

After allowing Petitioner that full and fair opportunity to address his pro se motions, Judge Tilley ruled that "[t]hey [we]re denied." (Id.; see also Oral Order dated Oct. 25, 2012 (denying Docket Entries 48, 53, 55, and 57).) Petitioner thereupon sought to raise "[his] other question, is there any way [he] can have new counsel appointed for [him] because [he] asked for these things and ha[d]n't received them. [He] made known certain facts to [his] attorney and [his attorney] ain't done nothing [sic] with them." (Docket Entry 150 at 5.) Judge Tilley, in turn, solicited comment from Mr. McClellan, who responded:

> [Petitioner] and I of course conversed a good bit about getting ready for trial. . . . I brought his girlfriend and her mother up here for testimony. We did not know exactly what Ms. Lark would say prior to the time of trial, although he had given me some information and it was my presumption that she would testify in accordance with information given. She testified somewhat differently, but that's the nature of trial, Your Honor.
> The agent who came in and testified, we asked him questions on direct examination about where he got the information. He testified that he did not get the information from [Petitioner] and certainly that's not a critical issue of the case.
>
> The issue of the case was who committed the robbery at [the victim business], not whether the agent actually got agents [sic] from one location or whether Ms. Lark

---

[6](...continued)
violated [his] 6th Amendment right."), 2 ("Expert testimony was requested by [Petitioner] to show weakness in the identification used to convict [Petitioner].").)

or somebody else provided the information.  I did ask him some of those questions in examination.

Since then, of course we've been preparing for sentencing.  <u>When I talked with [Petitioner] a couple of days ago, he indicated that he was satisfied with counsel to that point</u>.  Today when I talked to him, he's indicated he would rather have other counsel, and that the <u>motions that are before Your Honor [raise] the issue about ineffective assistance of counsel, not only alleged about myself, but also Mr. Dusenbury</u>, who was the initial attorney appointed in this case, so that's where I stand right now.

I'll be glad to do whatever the Court asks me to do, [if the Court] asks me to stay in the case.  I've gotten along well with [Petitioner].  I hope he's gotten along well with me.  I'll try to continue to help represent him the best that I can.  There are details of course with every case, somebody would like to have something extraordinary done to locate, for instance, like an expert witness to testify about whether somebody is wearing a mask or not, what effect that might be.  That's highly extraordinary, Your Honor, and certainly I d[id] not request from the Court [such] an expert.  He finds that a problem with me.

So I'll just leave that to the Court's discretion.

(<u>Id.</u> at 5-7 (emphasis added).)

Judge Tilley, at that point, asked Mr. McClellan if he could "fully represent [Petitioner] to the best of [his] ability" (<u>id.</u> at 7) and Mr. McClellan replied that he would "continue to do [his] very best for [Petitioner]" (<u>id.</u>).  Mr. McClellan, however, noted that, in light of the "pro se motions and memorand[a]" (<u>id.</u>), although Mr. McClellan "hope[d Petitioner] underst[ood] that [Mr. McClellan] will attempt to do [his very

19

best]" (id.), Petitioner perhaps should "articulate his feelings about that" (id.). Following that suggestion, Judge Tilley invited further input from Petitioner (see id. ("[Petitioner], talk to me.")), who rejoined:

> I guess really just what I pointed out to you, I just don't feel things that should have been done were done. Certain things that took place at trial that my attorney was made aware of. Brandi Lark received leniency. She gave a statement while in custody in jail and I don't see why he felt like not a relative [sic] factor to bring up before the jury, that wouldn't undermine her testimony or credibility as a witness. That's something major, and my lawyer don't [sic] feel like that's something that should have been brought up.
>
> It is a lot of little things adding to a lot of big things, and I'm the one paying the toll for it in the end. I don't feel like this is my best interest to keep going the way I've been going.

(Id. at 8 (emphasis added).)

Having again afforded Petitioner an uninterrupted opportunity to air any grievances, Judge Tilley found that "[Petitioner] ha[d] stated nothing that would warrant appointment of new counsel, so [Judge Tilley ] den[ied] that [request]." (Id.; see also id. ("Mr. McClellan is as thorough as any lawyer who appears in this [C]ourt. He has been doing it for years, and I've watched him doing it for years, and nobody crosses more T's or dots more I's than he does in getting ready for trial. . . . So I deny your motion for new counsel . . . .").) With all of Petitioner's pro se motions and requests

20

resolved, Judge Tilley "set this [case] for sentencing." (Id.; see also id. (setting new sentencing date).)

Petitioner (through Mr. McClellan) thereafter filed a sentencing memorandum, relating that "[Petitioner] contends that he is innocent of the offenses to [sic] which he is charged, and as [sic] of the jury's verdict, and maintains his innocence regarding the events surrounding the robbery of [the p]izza store that occurred on or about March 26 and 27, 2011." (Docket Entry 63 at 1 (emphasis added); see also id. (objecting that PSR "does not take into account [Petitioner's p]osition that he is not guilty of [the charged] offenses, but only recites facts related to the [p]osition of the Government, and/or the verdict of the jury").) That memorandum also lodged specific objections to certain findings and guideline calculations in the PSR, including (most prominently) by

> contend[ing] that the [s]tate [c]ourt cases which was [sic] heard and determined, by [p]lea [a]greement and by entry of [j]udgment on or about July 7, 2003, should be treated as one case for purposes of Career Offender status under U.S.S.G. §4B1.1(a), and that [Petitioner] should be determined to not have obtained or reached Career Offender status for [f]ederal sentencing purposes.

(Id. at 2; but see Docket Entry 64 at 4 (citing United States v. Collins, 412 F.3d 515 (4th Cir. 2005), as "adverse holding[]" which "may be contrary to [that p]osition," but "contend[ing]

21

that the decision in <u>Collins</u> is subject to further judicial review").)

At the sentencing hearing, Mr. McClellan acknowledged that precedent stood against Petitioner's objection to his career offender designation, but sought to preserve the issue for appeal. (<u>See</u> Docket Entry 79 at 3-6.) Judge Tilley (A) upheld the PSR's determination on that point (<u>see</u> <u>id.</u> at 5; <u>see also</u> <u>id.</u> at 7-9 (allowing Petitioner to argue career offender issue pro se and rejecting arguments as contrary to Judge Tilley's "understanding of the law for many, many years")), and (B) "accept[ed] the facts in the [PSR] and the application of the guidelines" (<u>id.</u> at 11),[7] which established an "advisory guideline [imprisonment] range . . . [of] 360 months to life, . . . divided between Count One, where there is a maximum of 20 years; and Count Two, where there is a mandatory minimum of seven [years], and possibly life" (<u>id.</u>).

Regarding Judge Tilley's ultimate selection of an appropriate sentence, Mr. McClellan began his argument by re-emphasizing that Petitioner's "position has been that <u>he's not</u> <u>guilty of the[se] offense[s]</u>" (<u>id.</u> at 12 (emphasis added); <u>see</u>

_____

[7] As Judge Tilley indicated, any other guideline issues "would only [have required] consider[ation] if there were not a career offender status, so since there [wa]s, th[e other issues] really [were] not material to the sentence." (Docket Entry 79 at 6.)

also id. at 11 ("[Petitioner] has pled not guilty and maintains his innocence regarding this particular event . . . .")), and – when given the last word, as Judge Tilley had promised (see id. at 10 ("I hear from the defense attorney, then I hear from the Government's attorney, so [] that [the d]efendant can have the opportunity to hear what each of the attorneys has to say before the defendant makes a statement . . . ."), 11 (making clear that, when called upon, Petitioner "may say whatever [he] would like")) – Petitioner never wavered from his adamant assertion of his innocence; instead, he merely "apologize[d] to [his family] for putting [them] through this again, and [he] thank[ed them] for being [t]here and standing by [him]" (id. at 20), before effectively declining to say anything of substance to Judge Tilley (see id. at 20-21 ("As far as the Court, you heard my arguments.  You rule how you rule . . . .  Like you say, I can bring it up to the [United States Court of Appeals for the] Fourth Circuit.  That's really about it.")).

Judge Tilley thereupon pronounced sentence:

[T]here are several things about the case which truly are concerning; the use of a firearm, the way the firearm was used, the fact that this was way down the list in a series of felony robberies with the use of a firearm for [Petitioner], and during [one such] use of a firearm [there] was a discharge of a firearm . . . .

Another concern is, that while some of the evidence was circumstantial, it was strong circumstantial

23

evidence. . . . [Y]et [Petitioner] allowed two people to get on the witness stand . . . and to commit perjury.

. . . [O]rdinarily, if this were not a career offender case, I would find obstruction of justice, but that goes away with the career offender [guideline], so I'm not going to add anything to it for that, but I'm going to recognize that.

There is no question that [Petitioner], who had not been out of prison long before resuming the robbery [pattern], poses a significant danger to the community, and [has shown] an unwillingness to change his behavior, his assaultive behavior, his use of a firearm, his threats against people.

This, I think, is exactly the type of case that the career offender status was designed to fit in. . . . [T]he advisory range in this case of 360 months to life, in considering [Petitioner's] age, in spite of the fact that he has been unable to alter his conduct to avoid using firearms to threaten and put others' lives in jeopardy, the 360 months, I think, is sufficient, . . . without going higher.

So I am going to adopt the recommendation of 360 months, which would be 2[40] months under Count One, followed by a consecutive 120 months under Count Two . . . .

(Id. at 21-22; see also Docket Entry 71 at 2 ("[Petitioner] is hereby committed to the custody of the United States Bureau of Prisons to be imprisoned for a total term of 360 months. 240 months as to Count 1; 120 months as to Count 2 to run consecutive to Count 1[.]" (bold font and brackets omitted)).)

Petitioner appealed his convictions and sentence. (See Docket Entry 67 at 1; see also Docket Entry 73 at 1 ("The [Fourth Circuit] appoint[ed] Kearns Davis to represent

24

[Petitioner] on appeal.").) "On appeal, [Petitioner] argue[d] that the evidence presented and argued by the Government at trial resulted in a fatal variance that require[d] th[e Fourth Circuit] to vacate his convictions. He also contend[ed] that th[is C]ourt erred in sentencing him as a career offender." United States v. Andrews, 547 F. App'x 248, 249 (4th Cir. 2013). "Based on [its] review of the record, [the Fourth Circuit] conclude[d] that no fatal variance occurred." Id. "The Government concede[d], however, that [Petitioner's] career offender sentence [wa]s improper after th[e Fourth Circuit's] decision in *United States v. Davis*, 720 F.3d 215 (4th Cir. 2013), and therefore that his sentence should be vacated and the case remanded for resentencing." Andrews, 547 F. App'x at 249; see also id. ("In *Davis*, th[e Fourth Circuit] held 'that a consolidated sentence under North Carolina law is a single sentence for purposes of the career offender enhancement.'" (quoting Davis, 720 F.3d at 216)). "Accordingly, [the Fourth Circuit] affirm[ed Petitioner's] convictions, vacate[d] his sentence, and remand[ed] for resentencing." Id. at 250.

Following that remand, Judge Tilley set this case for resentencing. (See Docket Entries 92-94; see also Docket Entry 87 at 1 (appointing Mr. Davis as Petitioner's counsel).) In advance of resentencing (and per the Fourth Circuit's later

25

recounting at the time of Petitioner's post-resentencing appeal), "the U.S. Probation Office issued a [m]emorandum that calculated [the Count One] total offense level as 22. The government then requested a two-level enhancement for obstruction of justice under U.S.S.G. § 3C1.1. A revised [m]emorandum added the enhancement as requested, increasing the total offense level to 24. [Petitioner] objected to the two-level enhancement for obstruction." United States v. Andrews, 808 F.3d 964, 967 (4th Cir. 2015).[8]

The Probation Office also dropped Petitioner's criminal history category down to III (see Docket Entry 91 at 1), because Davis not only precluded his designation as a career offender but also precluded assignment of criminal history points to his three sets of convictions for robberies and/or other violent crimes committed from 2000 to 2002, which formed part of the consolidated 2003 state judgment at issue in his appeal of his original sentence (see id. at 4-5 (discussing Docket Entry 63-1 at 2-4)). Given that consideration (as well as the preclusion

---

[8] The United States maintained that the obstruction enhancement applied because "[Petitioner] willfully put forth false, material testimony at his trial through alibi witnesses, [Ms.] Hunter and [Ms.] Moffett." (Docket Entry 91 at 2.) Petitioner countered that the record did not support an obstruction enhancement because it merely established "that [he] had allowed others to give testimony that may have been perjurious." (Docket Entry 95 at 2 (internal quotation marks omitted).)

26

of criminal history points for Petitioner's 2013 convictions in state court for two additional robberies for which he had awaited trial at the time of the offenses charged in the Indictment[9]), the United States took the position that "[Petitioner's] criminal history [category of III] substantially under-represent[ed] the seriousness of his criminal history and the likelihood he will commit other crimes" (id. at 6), such that, under U.S.S.G. § 4A1.3(a)(2), "[a]n upward departure [wa]s warranted" (id.), along with "an upward variance . . . under the factors set out in [18 U.S.C.] § 3553(a)" (id. at 7; see also id. at 7-8 ("Although no longer classified as a career offender, [Petitioner] has the type of criminal conviction history that calls for a variance upward to specifically deter [him] from committing robbery type offenses in the future.")). As with the obstruction enhancement, Petitioner objected to any upward departure or upward variance. (See Docket Entry 95 at 2-4.)

During the resentencing hearing, Judge Tilley heard extensive argument about the obstruction enhancement (see Docket Entry 103 at 5-15), before making a detailed oral ruling

---

[9] The guidelines assigned no criminal history points to those two robbery convictions because of their inclusion within another consolidated judgment, along with state offenses arising from the same offense conduct underlying the charges in the Indictment. (See Docket Entry 91 at 5 (discussing Docket Entry 91-1 at 1-3).)

27

upholding it (see id. at 15-18).  Consistent with that ruling, Judge Tilley "adopt[ed] the findings and guideline applications . . . in the [Probation Office's revised] memorandum where the total offense level [for Count One wa]s a 24.  Criminal history category [wa]s a III."  (Id. at 18.)  Both sides next argued exhaustively about the departure and variance issues (see id. at 19-35), after which Judge Tilley (once more in meticulous fashion) explained his decision to upwardly depart to criminal history category V (see id. at 36-37), moving Count One's advisory guideline imprisonment range to "92 to 115 [months]" (id. at 37).  With that new baseline, Judge Tilley allowed Mr. Davis, counsel for the United States, and Petitioner to each make final comments about an appropriate sentence (including any upward variance under Section 3553(a)).  (See id. at 37-40.)[10]

---

[10] Notably, although Petitioner's resentencing remarks took a more penitent tack than his initial sentencing allocution, he still could not bring himself to admit that he robbed the pizza store while brandishing a firearm.  (See Docket Entry 103 at 39-40 ("thank[ing his family] for standing by [him]," "apologiz[ing] to the Court and everybody else for even being here" (but not for doing anything), expressing generic desire "to apologize," describing himself as "remorseful for everything [he had] done" (without specifying anything he had done), and voicing his "hope [to] have the chance once again to make it home to [his] family and daughter").)  Indeed, while complimenting Petitioner's words as "very well said" (id. at 40), Judge Tilley pointed out that they sounded a familiar but discordant note by "apologiz[ing] to the Court" (id. at 41), while failing to acknowledge the harm Petitioner inflicted on "the people who are the victims of [the] robbery" (id.; see also (continued...)

"Considering the things that [the parties] ha[d] talked about
. . ., [Judge Tilley] f[ou]nd that[,] under Count One, a
sentence of 115 months, at the high end of that recast guideline
range, to be followed by a period of 84 months [on Count Two
wa]s sufficient to address the [Section] 3553(a) concerns."
(Id. at 40-41; see also Docket Entry 97 ("Amended Judgment") at
2 ("[Petitioner] is hereby committed to the custody of the
United States Bureau of Prisons to be imprisoned for a total
term of 199 months.  115 months as to Count 1; 84 months as to
Count 2 to run consecutive to Count 1." (bold font, asterisks,
and brackets omitted)).)

Petitioner appealed the Amended Judgment.  (See Docket Entry
98 at 1.)  "The sole issue before [the Fourth Circuit in that
appeal wa]s the propriety of the enhancement for obstruction of
justice," Andrews, 808 F.3d at 968, and the Fourth Circuit
resolved that issue by holding that Judge Tilley "properly
applied the enhancement to safeguard the integrity of the
proceedings," id. at 971; see also id. ("[The Amended J]udgment
is affirmed.")).  After the United States Supreme Court denied
review, see Andrews v. United States, 577 U.S. 1199 (2016),

---

¹⁰(...continued)
id. ("[V]ictims really do suffer.  It is a psychologically
traumatic event in their lives.")).

29

Petitioner timely filed the Section 2255 Motion, raising these three grounds for relief (as developed in his Memorandum):

1) "Violation of Due Process[,] Fifth Amendment" (Docket Entry 110, ¶ 12.A. ("Ground One")), in that Johnson v. United States, 576 U.S. 591 (2015) (ruling residual clause of "violent felony" definition in 18 U.S.C. § 924(e) void for vagueness), effectively invalidated the residual clause in 18 U.S.C. § 924(c)(3)(B) (defining "crime of violence"), without which Petitioner's conviction on Count Two could not stand, because Hobbs Act robbery does not qualify as a crime of violence under the force clause in 18 U.S.C. § 924(c)(3)(A) (see Docket Entry 111 at 4-28);

2) "Ineffective Assistance of Counsel, Sixth Amendment" (Docket Entry 110, ¶ 12.B. ("Ground Two")), in that "[b]oth [Mr.] Dusenbury and Mr. McClellan were ineffective during the plea negotiation process for relaying incorrect legal advice as well as failing to know the facts, circumstances, pleadings, evidence, and laws involved in [Petitioner's] case, and then offering correct legal advice to [sic] which [P]etitioner could rely on in deciding what plea to enter" (Docket Entry 111 at 30-31); and

3) "Ineffective Assistance of Counsel" (Docket Entry 110, ¶ 12.C. ("Ground Three")), in that "[a] thorough investigation

30

in this case related to the career offender status was warranted by counsel but never happened" (Docket Entry 111 at 42; see also id. ("Had that investigation been done, it would have put [Petitioner] in a much better position during the plea negotiation process.")).

"[P]ursuant to the General Order Governing Claims Related to Johnson . . ., the Office of the Federal Public Defender [wa]s appointed to represent [Petitioner on Ground One] and the [Section] 2255 Motion [wa]s stayed for a period of 45 days . . . to permit review by counsel." (Text Order dated July 27, 2016 (all-caps font omitted) (underscoring added)); see also Second Text Order dated May 20, 2020 (allowing Federal Public Defender to withdraw in favor of substitute counsel); Docket Entry 133 at 1 (designating Brian Aus to represent Petitioner on Ground One).) The Court (per the undersigned Magistrate Judge) thereafter extended the stay pending rulings by the Fourth Circuit in cases raising issues similar to Ground One. (See Text Order dated Sept. 14, 2016.) During the pendency of that stay, Petitioner filed the First Motion to Amend, adding a fourth ground for relief, i.e., that "[Petitioner] was denied his [S]ixth [A]mendment right to effective assistance of counsel as a result of counsels [sic] failure to properly apply the 'FRCP' and law(s) as it applied to [Petitioner.]" (Docket Entry

120 at 2; <u>see also</u> <u>id.</u> at 4 ("Upon presentment of the charging document and/or [I]ndictment (True Bill), counsel had the legal obligation as [Petitioner's] appointed fiduciary trustee to discharge the debt. Had counsel on behalf of [Petitioner ] accepted for Value, Consideration, Full Settlement, and Closure of the Account(s), [p]ursuant to Rule 8 of the Federal Rules of Criminal Procedure, these proceedings would've been properly handled and the charge(s)/Account(s) would have been discharged." (internal parenthetical citation omitted)).)[11]

The Court (per the undersigned Magistrate Judge) subsequently "lift[ed the] stay . . . and directed the United States to file any response to [the Section 2255] Motion (as developed in [the] Memorandum) and [to the First] Motion to Amend . . . ." (Text Order dated Dec. 4, 2019.) After obtaining several extensions (<u>see</u> Text Orders dated Feb. 4, 2020, Mar. 5, 2020, and Apr. 6, 2020), the United States responded (<u>see</u> Docket Entry 126 ("Response")). A few days later, the Clerk received (and docketed) the Second Motion to

---

[11] Because Petitioner filed the First Motion to Amend before the United States responded to the Section 2255 Motion, Ground Four became a part of this habeas action "as a matter of course," Fed. R. Civ. P. 15(a)(1); <u>see also</u> 28 U.S.C. § 2242 ("[Habeas actions] may be amended or supplemented as provided in the rules of procedure applicable to civil actions.").

Amend, which proposed the addition of two more grounds for relief (excerpted, in pertinent part, below):

<u>Ground Five</u>

[Petitioner] was denied his Sixth [A]mendment right to effective counsel/assistance of counsel as a result of counsels [sic] failure to bring to the [C]ourts [sic] attention the faulty/or defective [I]ndictment (True Bill) at any stage during the proceedings.

A. Both [Mr.] Dusenbury and [Mr.] McClellan failed to raise the claim that the [I]ndictment presented to [Petitioner] didn't show his liability to the statutes, codes, or ordinances on its face. The very thing needed to even bring forth a charge of any kind. If there is no liability to the statute(s), code(s), or ordinance(s) then there is no foundation for a charge.

Under the Common Law Rule, FRCP, FDCPA, and 28 U.S.C. without showing liability on the face of the instrument, the prosecution has failed to state a claim.

[W]ithout verification of the debt, upon timely demand therefore, Scienter and Felony Fraud ensues.

If the Accusations state that you violated some statute, code, or ordinance it must be supported by the affidavit of the accusing officer, agent swearing that you are subject to the statute, code, or ordinance and therefore have a liability to that particular statute, code, or ordinance.

. . . .

. . . Upon presentment of the [I]ndictment (True Bill), counsel being competent would've immediately informed his client, then the [C]ourt of the fact that the [I]ndictment provided to his client failed to show and/or state his clients [sic] liability upon it's [sic] face.

33

At no time did counsel bring to the [C]ourt's attention during any stage of the proceedings (Discovery, Jury Instructions, Opening or Closing Arguments, Sentencing, Trial) the fact that his clients [sic] liability to the statute(s), code(s), or ordinance(s) were ever presented or proven to the jury. Thereby making a fair and informed trial unobtainable.

Because both Mr. Dusenbury and Mr. McClellan failed to raise this issue[, Petitioner] was never made aware of the nature and cause of the accusations against him, nor of his liability under the statute. Thereby depriving [him] of the fundamental right to defend himself or knowing just what he was defending against.

Certainly if either Attorney had performed effectively then [Petitioner] would've had the chance to [sic] a fair trial. As such[, he] was forced to defend himself with both hands tied behind his back. [Petitioner's] liability to the statutes is the very foundation needed to persue [sic] charges, if the prosecution couldn't provide the appropriate documents then the charges would've had to be thrown out/dismissed.

. . . .

## Ground Six

### Actual Innocence

[Petitioner] was denied his constitutional right to a fair trial and discovery by prosecutions [sic] failure to disclose [Petitioner's] liability on the face of the [I]ndictment or to disclose [his] liability in discovery turned over to [his] attorney.

. . . .

Peti[ti]oner was charged and presented with an [I]ndictment/True Bill that never showed Petitioner's liability on it's [sic] face. Without such information the Prosecution failed to state a claim. During the proceedings Prosecution also failed to disclose Petitioner's liability in the discovery

34

turned over to Peti[ti]oner's attorney. By nature
such material would be favorable to Petitioner.
Prosecutions [sic] failure to disclose favorable
discovery material made Petitioners [sic] subsequent
trial and conviction improper and unconstitutionally
fair. Petitioners [sic] liability was never presented
to the jury so the jury never found Petitioner guilty
of being liable to the statute(s). Because a persons
[sic] [l]iability is the only thing that can form a
basis for, or give rise to, any charge, it is
paramount that [Petitioner] be informed of the nature
and cause of any charges or accusations he must face.
In order to give the U.S. Prosecutor the ability to
charge you and the U.S. Court the ability to take
jurisdiction there must be a swearing to your
liability under the statute(s), code(s), or etc., by
the accusing officer or agent at a Grand Jury
[h]earing. This swearing must be of his own
knowledge. If there is a liability to the statute(s)
or code(s) and it is not stated on the face of the
charging instrument, then it is discovery by subpoena
or subpoena duces tecum. If [] Petitioners [sic]
charging instrument is the [I]ndictment, then the
transcript of the Grand Jury must be [s]ubpoenaed up
with a subpoena duces tecum. The witness that
testified in front of the Grand Jury, under oath must
also be subpoenaed so his testimony in front of the
Grand Jury can be cross examined.

[Petitioner] was never made aware of the nature or the
cause of any of the charges or accusations against
him. Thereby rendering any of the proceedings
following the presentment of the [I]ndictment unfair
constitutionally [sic]. If [Petitioner] wasn't
engaged in any activity that rendered him liable and
therefore subject to a statute, then [he] had no
liability to that statute and therefore lacked the
requisite intent . . . or capacity to violate it.
[Petitioner's] liability to a statute or code is the
only thing that can form a basis for, or give rise to,
any charge. [He] has a constitutional right to be
made aware or correctly informed of the nature & cause
of any charges.

(Docket Entry 128 at 2-5 (internal quotation marks and some subheadings omitted) (incomplete sentences as in original); <u>see also</u> Docket Entry 129 at 1 (requesting subpoena for grand jury transcript).)

During this same time-period, the Court (per the undersigned Magistrate Judge) extended the deadline for both Petitioner and his Ground One counsel (Mr. Aus) to reply to the Response. (<u>See</u> Text Orders dated May 20 and 29, 2020.) However, before Mr. Aus could file any reply addressing Ground One, Petitioner "request[ed] this [C]ourt to allow [him] to represent himself on all matters related to his [Section] 2255 [M]otion." (Docket Entry 135 at 1 (misplaced hyphen omitted).) In that motion, Petitioner also "request[ed] this [C]ourt to <u>dismiss any and all other motions filed on his behalf except for DE #128 and DE #129</u>." (<u>Id.</u> (emphasis added).) The Court (per the undersigned Magistrate Judge) granted Petitioner's request to discharge Mr. Aus. (<u>See</u> Text Order dated June 10, 2020.) Petitioner thereafter filed a reply which discusses the claims in the Section 2255 Motion and First Motion to Amend as if he maintained them (notwithstanding his above-quoted request for dismissal of <u>all</u> his pending motions <u>other than</u> the Second

36

Motion to Amend and related subpoena request). (See Docket Entry 138 ("Reply") at 1-8.)[12]

DISCUSSION

As an initial matter, the Court should refuse Petitioner any relief on the Section 2255 Motion and the First Motion to Amend, because he unambiguously "request[ed] this [C]ourt to dismiss any and all other motions filed on his behalf except for DE #128 and DE #129." (Docket Entry 135 at 1 (emphasis added).) The fact that the Reply evidently reverts back (sub silentio) to embracing Grounds One through Four (from the Section 2255 Motion and the First Motion to Amend) does not alter the propriety of summary denial. "A petition for writ of habeas corpus is not a game the law affords incarcerated people." Williams v. Lockhart, 862 F.2d 155, 161 (8th Cir. 1988) (Lay, J.,

---

[12] Shortly after filing the Reply, Petitioner submitted a copy of a letter he received from Mr. McClellan "remind[ing Petitioner] that [he previously] took the position that [he] w[as] not guilty of all offenses and [he] did not wish to take any plea under any circumstance." (Docket Entry 143-1 at 2; see also id. at 2-3 ("You, in particular, indicated you had an alibi witness in Charlotte . . . . [Y]ou always took the position with me that you were not guilty of the offense. Furthermore, you took the position that you wanted to have the alibi witness testify in your behalf . . . . I cannot recall any time in which you said you were willing to accept a plea. That was the reason for your trial and plea of not guilty, and certainly there was no discussion of a '30 year sentence'. . . . [T]here were no serious discussions about a plea entry on your behalf, nor were there any discussions at any time for a plea for a certain number of years or months.").)

37

concurring); see also United States v. Paglia, 190 F.2d 445, 447-48 (2d Cir. 1951) ("Justice is not a game; there is no constitutional right to throw dust in a juryman's eyes, or hoodwink a judge who is not overwise." (internal quotation marks omitted)). As detailed in the Introduction, Petitioner repeatedly has abused this Court's processes, including by orchestrating the presentation of a false alibi at his trial. The Court need not waste more of its scarce resources indulging Petitioner's vacillations over what collateral claims he wants to pursue. See United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990) ("[A] litigant has an obligation to spell out its arguments squarely and distinctly, or else forever hold its peace." (internal quotation marks omitted)); Zambrana v. United States, 790 F. Supp. 838, 843 (N.D. Ind. 1992) ("Even pro se litigants are held to minimal standards of pleading and motion practice, and in framing their grounds for § 2255 relief it is well for them to remember . . . [that j]udges are not like pigs, hunting for truffles buried in briefs." (internal quotation marks and italics omitted)).

The frivolous nature of the (non-abandoned) Second Motion to Amend reinforces the conclusion that this collateral action attacking Petitioner's convictions constitutes nothing but a revival of his earlier efforts to obstruct his prosecution

38

(which included thwarting Mr. Dusenbury's performance of his professional duties, filing baseless pro se motions while represented by Mr. McClellan, and presenting fraudulent alibi evidence at trial, all as shown in the Introduction). In that regard, even a cursory review of proposed Grounds Five and Six (quoted at length in the Introduction) reveals their wholly meritless character. For example, proposed Ground Five alleges (in repetitive and conclusory terms) that Mr. Dusenbury and Mr. McClellan should have challenged the Indictment on the theory that it "didn't show [Petitioner's] liability to the statutes, codes, or ordinances on its face." (Docket Entry 128 at 2; see also, e.g., id. at 3 ("Upon presentment of the [I]ndictment (True Bill), counsel being competent would've immediately informed his client, then the [C]ourt of the fact that the [I]ndictment provided to his client failed to show and/or state his clients [sic] liability upon it's [sic] face.").) Proposed Ground Six's claim for "Actual Innocence" (id. at 4) relies on the same bald allegation that "[Petitioner] was charged and presented with an [I]ndictment/True Bill that never showed [his] liability on it's [sic] face" (id.; see also, e.g., id. at 5 (asserting without support that "[Petitioner] was never made aware of the nature or the cause of any of the charges or accusations against him")).

39

In fact, the Indictment unambiguously charged Petitioner with (A) violations of two specific federal criminal statutes (i.e., the Hobbs Act and Section 924(c)), (B) based on specific conduct (i.e., interference with commerce by robbery of a business, further described as unlawful taking of money by force, still further described as brandishing a firearm and making (directly quoted) demands/threats), (C) committed at a specific location on specific dates (i.e., a business address in Kannapolis on March 26-27, 2011). (See Docket Entry 1 at 1-3.) With equally frivolous flourish, proposed Ground Six decries the "[p]rosecutions [sic] failure to disclose favorable discovery material" (Docket Entry 128 at 4), but does not identify any (supposedly) withheld material or (concrete) resulting prejudice (see id. at 4-5). Additional indicia of the frivolousness of proposed Grounds Five and Six include the interspersing – among the above-noted (conclusory and/or demonstrably false) allegations about the Indictment and discovery process – of nonsensical phrases, such as:

1) "the prosecution has failed to state a claim" (id. at 2 (internal quotation marks omitted));

2) "without verification of the debt, upon timely demand therefore, Scienter and Felony Fraud ensues" (id. (internal quotation marks omitted)); and

40

3) "Petitioners [sic] liability was never presented to the jury so the jury never found Petitioner guilty of being liable to the statute(s)" (id. at 4).

Considering all these circumstances, the Court should reject the Second Motion to Amend, because its proposed Grounds Five and Six are "vague, conclusory, speculative, and unsupported and fail[] for all these reasons." Cabrera v. United States, Nos. 1:09CR323-1, 1:12CV695, 2014 WL 6386902, at *9 (M.D.N.C. Nov. 14, 2014) (unpublished) (Osteen, C.J.); see also United States v. Shipman, 190 F. App'x 289, 291 (4th Cir. 2006) ("find[ing] meritless [the defendant's] conclusory claims of . . . violation of [disclosure requirements of] *Brady v. Maryland*, 373 U.S. 83 (1963)" (parallel citations omitted)); Oken v. Corcoran, 220 F.3d 259, 269 (4th Cir. 2000) ("[C]ounsel was not constitutionally ineffective in failing to object [on the basis suggested] . . . because it would have been futile for counsel to have done so . . . ."); Curtis v. Virginia, No. 7:20CV414, 2021 WL 4807627, at *10 (W.D. Va. Oct. 14, 2021) (unpublished) ("[T]here is no recognized freestanding federal claim of actual innocence. . . .").[13]

---

[13] "[Habeas actions] may be amended or supplemented as provided in the rules of procedure applicable to civil actions." 28 U.S.C. § 2242. Under said rules, "[a] party may amend its pleading once as a matter of course within . . . 21 days after
(continued...)

41

Finally, to the extent the Court does not deem the Section 2255 Motion and First Motion to Amend abandoned, it nonetheless should deny their requests for relief, because Grounds One through Four all suffer from fatal defects. To begin, as set out in the Introduction (and like claims litigated by numerous petitioners convicted of Section 924(c) crime-of-violence-predicated offenses), Ground One "seek[s] relief based on Johnson, in which the Supreme Court held that the 'residual clause' of 18 U.S.C. § 924(e)(2)'s definition of 'violent felony' [wa]s unconstitutionally vague," Dorsey v. United States, No. 1:99CR203-2, 2019 WL 3947914, at *1 (E.D. Va. Aug. 21, 2019) (unpublished) (internal citation and full case name omitted), appeal dismissed, 797 F. App'x 798 (4th Cir. 2020). More precisely, Ground One (again, as documented in the

_____

[13](...continued)
service of a responsive pleading . . . ." Fed. R. Civ. P. 15(a)(1). Because (as the Introduction shows) Petitioner used his lone, matter-of-course amendment when he filed the First Motion to Amend, he may amend this habeas action via the Second Motion to Amend "only with . . . written consent [by the United States] or the [C]ourt's leave," Fed. R. Civ. P. 15(a)(2). The Second Motion to Amend does not tender written consent by the United States to the addition of proposed Grounds Five and Six. (See Docket Entry 128 at 1-5.) Petitioner thus must obtain judicial leave for the Second Motion to Amend, which the Court may deny, if the record reflects "bad faith, undue prejudice to the opposing party, or futility of amendment," United States v. Pittman, 209 F.3d 314, 317 (4th Cir. 2000). Here, for the reasons stated above, the Court should deny the Second Motion to Amend due to Petitioner's pattern of bad faith litigation conduct and the futility of the proffered amendment.

42

Introduction and akin to claims brought by many other similarly-situated petitioners) maintains that Johnson's reasoning invalidated the comparable "residual clause" portion of the definition of "crime of violence" applicable to Section 924(c) offenses, such that Petitioner's "[Section] 924(c) conviction should be vacated because the predicate offense no longer qualifies as a crime of violence," id. (internal parenthetical omitted)). Consistent with the first premise of Ground One, "the Supreme Court [since has] held that the residual clause of [Section] 924(c)(3)'s definition of 'crime of violence' is also unconstitutionally vague." Id. (citing United States v. Davis, ___ U.S. ___, ___, 139 S. Ct. 2319, 2336 (2019)).

The Supreme Court's holding in Davis establishes that Section 924(c)'s residual clause "cannot be used to support [a Section] 924(c) conviction. What remains is the question whether the predicate offense underlying . . . [Petitioner's Section 924(c) conviction] qualifies as a 'crime of violence' under [Section] 924(c)'s force clause. If it so qualifies, [his Section 924(c)] conviction remains valid . . . ." Id. at *2. The Fourth Circuit has definitively answered that question by "conclud[ing] that Hobbs Act robbery constitutes a crime of violence under the force clause of Section 924(c)." United States v. Mathis, 932 F.3d 242, 266 (4th Cir. 2019). Ground One

43

thus lacks merit.  <u>See, e.g.,</u> <u>Lloyd v. United States</u>, Nos. 1:12CR449-2, 1:16CV627, 2019 WL 4600211, at *1 (M.D.N.C. Sept. 23, 2019) (unpublished) (Eagles, J.) ("find[ing] that [analogous] claim fail[ed] on the merits" in light of <u>Mathis</u>).

That determination leaves Grounds Two, Three, and Four, all of which (as shown in the Introduction) present ineffective assistance of counsel claims.  To make out such claims, Petitioner must prove that his counsel's performance fell below a reasonable standard for defense attorneys and that prejudice resulted.  <u>See</u> <u>Strickland v. Washington</u>, 466 U.S. 668, 687–94 (1984).  "Surmounting *Strickland*'s high bar is never an easy task. . . . [T]he standard for judging counsel's representation is a most deferential one." <u>Harrington v. Richter</u>, 562 U.S. 86, 105 (2011) (internal quotation marks omitted); <u>see also</u> <u>Strickland</u>, 466 U.S. at 694 (defining prejudice as "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different").  Grounds Two, Three, and Four do not clear <u>Strickland</u>'s high bar.

Starting with the last of those ineffectiveness claims, Ground Four contends that "[b]oth [Mr. Dusenbury and Mr. McClellan] failed to properly apply an 'Affirmative Defense,' pursuant to the 'FRCP' and other pertinent law(s)" (Docket Entry

44

120 at 2), with this incomprehensible exegesis offered to support that contention:

> The Common Law Rule of Confession and Avoidance fall [sic] under Affirmative Defenses.  The Law Merchant, the Law of Principle & Equity, The Law of Discharge, The Law of Satisfaction, Bankruptcy are Affirmative Defenses.  Pursuant to Rule 8 of the FRCP, Affirmative Defenses are the correct avenue to seek Remedy, and/or discharge.
>
> Pursuant to Rule 13 of the FRCP, when a claim arises from the same transaction or occurence [sic], it's mandatory that you file a counterclaim.  A counterclaim for post settlement and closure of the account under Public Policy.
>
> . . . Upon presentment of the charging document and/or [I]ndictment (True Bill), counsel had the legal obligation as [Petitioner's] appointed fiduciary trustee to discharge the debt.  Had counsel[,] on behalf of [Petitioner], accepted for Value, Consideration, Full Settlement, and Closure of the Account(s) (case number 1:12-cr117-NCT-1/Appeal 13-4126), [p]ursuant to Rule 8 of the Federal Rules of Criminal [sic[14]] Procedure, these proceedings would've been properly handled and the charge(s)/Account(s) would have been discharged.
>
> At no time during any of these proceedings did either [Mr.] Dusenbury or [Mr.] McClellan fulfill their legal or fiduciary obligation on behalf of [Petitioner].  Thereby waving [sic] and/or stripping [him] of his fundamental right to Honor the Courts and discharge the debt.
>
> Because of both attorney's [sic] failure to exercise [Petitioner's] fundamental right to discharge a debt,

---

[14] Federal Rule of <u>Criminal</u> Procedure 8 concerns joinder of offenses and defendants in an indictment.  <u>See generally</u> Fed. R. Crim. P. 8.  Petitioner may have intended to refer to Federal Rule of <u>Civil</u> Procedure 8, which includes a subsection on affirmative defenses in <u>civil</u> actions, <u>see</u> Fed. R. Civ. P. 8(c).

45

[he] was subsequently convicted on both counts and sentenced to 199 months in a [f]ederal [p]rison.

Certainly had either attorney performed his legal obligation as [Petitioner's] appointed fiduciary trustee, and accepted the charge(s) for Value, Consideration, Full Settlement, and Closure of the Account(s), thereby Honoring the Courts and discharging the debt, [Petitioner] wouldn't be serving a 199 month sentence in a [f]ederal [p]rison.

. . . The appropriate remedy in this case is to remand to the start of these proceedings (Initial Appearance), thereby allowing [Petitioner] a chance to cure the dishonor and discharge the debt. Or allow [the attachments to the First Motion to Amend[15]] to stand as [his] Acceptance for Value & Consideration. Thereby curing dishonor.

(Id. at 2-5 (internal quotation marks, ellipsis, emphasis, and subheadings omitted) (incomplete sentences as in original).)

To state the obvious up front, in the succinct words of another court within the Fourth Circuit faced with strikingly similar, post-conviction allegations from "[a] petitioner

---

[15] Petitioner attached to the First Motion to Amend copies of the Indictment and Amended Judgment with handwritten notations that echo Ground Four's bizarre allegations. (See Docket Entry 120 at 9 (last page of Indictment with notation reading: "I accept your charges for Value & Consideration in return for Post Settlement and Closure of Account(s) 1:12-cr-00117-NCT-1/Appeal 13-4126 and AUTOTRIS and CUSIP ACCOUNT #084665073 and #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. Please use my Exemption for Full Settlement and Closure of this Account as this account is Pre-Paid and Exempt from Levy. Pursuant to Rule 8 of the FRCP, I accept the Charges for Value and Consideration in return please use my Exemption as Principal for Post-Settlement and Clousure [sic] of Case Number 1:12-cr-00117 084665073/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. As this account is Pre-Paid and Exempt from Levy."), 10 (first page of Amended Judgment with same type of notation).)

attempt[ing (A)] to assert a counterclaim for 'post settlement and closure of the account under public policy," <u>Burton v. United States</u>, No. 5:11CV88, 2012 WL 1933667, at *2 (N.D.W. Va. May 25, 2012) (unpublished), as "authorized under 'commercial law . . . [and] Lex Mercantoria (Law Merchant),'" <u>id.</u>, (B) to "assert[] the 'common law remedy of confession and avoidance, citing Rule 8 of the Federal Rules of Civil Procedure," <u>id.</u>, (C) to invoke "'Uniform Commercial Code [("UCC")] authority,'" <u>id.</u>, and (D) to "claim[] that th[e c]ourt 'should honor [his] acceptance for honor and discharge [his] case to full post settlement and closure for value and consideration,'" <u>id.</u>: "[Ground Four] must be denied as unintelligible and dismissed with prejudice." <u>Id.</u> at *3.

Courts which have delved a bit deeper into claims of this ilk have linked them "to a theory that can be broadly referred to as the 'redemption' theory . . . ." <u>United States v. Staten</u>, No. 1:10CR179, 2012 WL 2389871, at *2 (M.D. Pa. June 25, 2012) (unpublished) (discussing arguments by defendant that, "'[a]s a citizen, [he] must be given a way out, according to Rule 8, affirmative defense'"); <u>see also</u> <u>United States v. Ornelas</u>, No. Crim. No. 05-321, 2010 WL 4663385, at *1 (S.D. Ala. Nov. 9, 2010) (unpublished) ("[The defendant] submit[ted] a copy of the [j]udgment in this case bearing a large stamp reading in part,

47

'Acceptance for Value and returned for value for settlement and closure' . . . . Prisoners have sporadically attempted to foist such frivolous, irrational, unintelligible UCC-related arguments on federal district courts for years. Such efforts (which broadly fall under the theory of 'redemption') have uniformly been rejected in summary fashion . . . .”); <u>United States v. Steiger</u>, No. CR-09-8004, 2010 WL 11534592, at *5 (D. Ariz. Oct. 20, 2010) (unpublished) (“Redemption theory explains the origins and theoretical underpinnings of many of the [defendants'] seemingly nonsensical ideas and actions, including their attempts to accept and return the[ir] indictment for value . . . .”). “This theory advocates that an individual can 'redeem' himself through the filing of commercial documents.” <u>Staten</u>, 2012 WL 2389871, at *3 (block-quoting <u>Monroe v. Beard</u>, No. 05CV4937, 2007 WL 2359833, at *2 (E.D. Pa. Aug. 16, 2007) (unpublished)); <u>see also</u> <u>id.</u> (continuing <u>Monroe</u> block-quote: “According to the [redemption] theory, the convict has a split personality: a real person and a fictional person called a 'strawman.' . . . Proponents of the theory believe that the government only has power over the strawman and not the real person. The real person, however, can 'redeem' the fictional person by filing a [document using UCC-derived language]. This

48

allows the real person to acquire an interest in the fictional person that trumps the government's power.").

Some courts have traced the redemption theory to a re-imagining of what happened "when the United States went off the gold standard in 1933 and [purportedly] pledged its citizens as collateral for its national debt." Id. (block-quoting Monroe, 2007 WL 2359833, at *2); but see Taylor v. United States, Crim. No. 10-297, Civ. No. 13-3816, 2015 WL 2395146, at *1 & n.1 (D. Md. May 18, 2015) (unpublished) (assessing the petitioner's proposal to "'stipulate to all the facts and accept and return the same for full settlement and closure in the transaction'" as "indicative of a 'flesh-and-blood' or 'sovereign citizen' defense" derived from "fundamental misunderstanding of the Constitution, the Fourteenth Amendment, [and related] history" and citing United States v. Mitchell, 405 F. Supp. 2d 602, 603-06 (D. Md. 2005) (connecting defendants' UCC-based attack on federal criminal prosecution to "famously discredited notion: the illegitimacy of the Fourteenth Amendment")). Whatever the faulty historical foundation on which Ground Four rests, one thing remains clear:

> [This ground for relief] relate[s] somehow to Petitioner's counsel failing to advise him the charges against him were commercial in nature or failing to advise him of some commercial aspect about his charges.

49

. . . .

> [The allegations supporting this ground for relief]
> are couched as instances in which [Petitioner] claims
> to have received ineffective assistance of counsel. .
> . .

> In this case, none of [these allegations] identifies
> a recognizable obligation which his attorney[s] failed
> to satisfy. As the [foregoing discussion] explain[s],
> Petitioner's assertions are completely nonsensical,
> indecipherable, and unintelligible. . . . Thus,
> Petitioner has failed both prongs of the *Strickland*
> requirements . . . .

Carlisle v. United States, Nos. 1:06CR140-7, 1:07CR6049,
1:08CV55 & 228, 2010 WL 2653356, at *3 (E.D. Tenn. June 28,
2010) (unpublished) (internal quotation marks and parenthetical
citation omitted); see also Oken, 220 F.3d at 269 ("[C]ounsel
was not constitutionally ineffective in failing to object [on
the basis suggested] . . . because it would have been futile for
counsel to have done so . . . ."); Staten, 2012 WL 2389871, at
*3 ("Courts across the United States have uniformly rejected
arguments based on the redemption theory or substantially
similar theories.").

Turning lastly to Grounds Two and Three, Petitioner thereby
has lodged inter-connected claims of plea-related
ineffectiveness. (See Docket Entry 111 at 32 (alleging as to
Ground Two: "[Mr. Dusenbury] erroneously told [P]etitioner that
. . . by pleading guilty he would be sentenced to at least 30
years and up to life. Counsel based this assumption on his

50

erroneous belief that [Petitioner] was in fact a Career Offender." (parenthetical citation omitted)), 34 (alleging as to Ground Two: "As part of th[eir first] conversation[, Petitioner] asked [Mr. McClellan] if there were any [plea] offers made, to which [he] stated that the only offer was to both counts for a total of 30 years imprisonment . . . . Prior to sentencing, [Mr. McClellan] and [P]etitioner went over the PSR where [Petitioner] again explained to M[r]. McClellan that [Petitioner] was in fact not a career offender. . . . [Mr. McClellan] gave faulty legal advice relating to the sentencing exposure if [P]etitioner entered into a plea . . . ." (periods in PSR omitted)), 40 (alleging as to Ground Three: "Both [Mr. Dusenbury and Mr. McClellan] failed to do basic research which resulted in their ignorance of a point of law that was fundamental to [Petitioner's] case."), 41 (alleging as to Ground Three: "Counsel rather than doing research on the facts and law [about the career offender issue] . . . took the governments [sic] position which left [Petitioner] at a complete disadvantage in the plea negotiation process."), 42 (alleging as to Ground Three: "A thorough investigation in this case related to the career offender status was warranted by counsel but never happened. Had that investigation been done, it would have put

51

[Petitioner] in a much better position during the plea negotiation process.").)

As those parenthetical quotations show, Grounds Two and Three (primarily for the former and entirely for the latter) revolve around the premise that Mr. Dusenbury and Mr. McClellan should have concluded and advised Petitioner (prior to trial) that – despite his numerous convictions for robbery with a dangerous weapon and assault with a deadly weapon with intent to kill (as detailed in the Introduction) – he would not qualify as a career offender under the Sentencing Guidelines. Moreover, Grounds Two and Three would have the Court label Mr. Dusenbury and Mr. McClellan professionally negligent for failing to reach that conclusion (and to advise Petitioner accordingly) solely because, in resolving his (first) direct appeal, the Fourth Circuit ruled (based on its decision in Davis issued after Petitioner's trial and sentencing) that his North Carolina convictions consolidated for judgment counted as only one predicate under the career offender guideline. (See id. at 33 (arguing as to Ground Two: "[W]hen counsel advised [Petitioner] that he was a career offender he was simply wrong. [Petitioner] presented this argument to counsel explaining why [Petitioner] was not a career offender . . . . [Petitioner's] argument in fact turned out to be true." (citing Andrews, 547 F. App'x at

52

248)), 41-42 (arguing as to Ground Three: "The issue was that [Petitioner] was not a career offender as he received a single sentence on multiple charges that were consolidated in the North Carolina [s]tate [c]ourt. . . . [Petitioner] himself argued that he was not a career offender. . . . In fact, [Petitioner's] argument was proven to be correct by the Fourth Circuit when it remanded his case finding he was not a career offender. The decision in [Petitioner's] case was a direct result of the Fourth Circuits [sic] decision in [Davis]." (internal citation omitted) (citing Andrews, 547 F. App'x at 248)).

Any ineffectiveness claim so premised (which, as noted above, would include most of Ground Two and all of Ground Three) obviously fails as a matter of law, because (as articulated in the Response) "Mr. Dusenbury was not bound to predict the future state of the law" (Docket Entry 126 at 8-9) and, "as stated [] with respect to Mr. Dusenbury, [Mr. McClellan wa]s not required to predict the future course of changes to the law" (id. at 11). See Cuthrell v. United States, Nos. 1:11CR212-3, 1:14CV659, 2017 WL 3394602, at *3 (M.D.N.C. Aug. 7, 2017) (unpublished) ("[The p]etitioner's [ineffective assistance claim] lacks merit because his counsel could not have been ineffective for failing to anticipate the Fourth Circuit's decision in Davis . . . ."),

53

recommendation adopted, 2017 WL 11428869 (M.D.N.C. Oct. 5, 2017) (unpublished) (Schroeder, J.); accord, e.g., Sweat v. United States, Nos. 1:05CR280-3, 1:12CV608, 2019 WL 8329859, at *3 (M.D.N.C. July 5, 2019) (unpublished) (Peake, M.J.), recommendation adopted, 2019 WL 8329736 (M.D.N.C. July 29, 2019) (unpublished) (Schroeder, C.J.); Moye v. United States, Nos. 4:10CR80, 4:13CV233, 2016 WL 4004580, at *9 (E.D.N.C. May 26, 2016) (unpublished), recommendation adopted, 2016 WL 3983416 (E.D.N.C. July 25, 2016) (unpublished); Peques v. United States, Nos. 3:10CR82, 3:13CV603, 2016 WL 55286, at *3 (W.D.N.C. Jan. 5, 2016) (unpublished); see also United States v. McNamara, 74 F.3d 514, 516 (4th Cir. 1996) (reiterating general principle that "attorney's failure to anticipate a new rule of law [i]s not constitutionally deficient").

In developing Ground Two, the Memorandum also asserts that Mr. Dusenbury errantly warned Petitioner that, "by pleading guilty [he would] . . . fac[e] a 360 month sentence" (Docket Entry 111 at 32), because that warning did not account for "the 3 points for acceptance of responsibility that were baked into the plea agreement" (id.; see also id. ("The plea agreement also contained a provision wherein the government would recommend a total 3-point decrease pursuant to U.S.S.G. § 3E1.1(a) [and] (b)." (spaces added))), which "would have resulted in a 262-327

54

month sentence" (id.; see also Docket Entry 111-1 at 2-3 (declaring in "Affidavit" that Mr. Dusenbury "told [Petitioner] that if [he] accepted the offer, [he] would get 30 years at a minimum and up to life," but "[e]ventually[ he] learned . . . that[,] if [he] had entered a plea with acceptance of responsibility, [his] guideline range would have been 262-327 months if [he] was a career offender, not 360 months to life")).[16] For several reasons, those assertions by Petitioner cannot support a finding that Mr. Dusenbury performed unreasonably.

First, Petitioner did not execute his Memorandum or his Affidavit under oath or in compliance with the requirements of 28 U.S.C. § 1746. (See Docket Entry 111 at 44 (signing Memorandum as merely "Respectfully Submitted"); Docket Entry 111-1 at 4 (bearing notation of "Signed under the penalty of perjury," but without declaration "that the foregoing is true and correct," 28 U.S.C. § 1746).)[17] In other words, each of

_____

[16] Pin cites to that Affidavit refer to page numbers in the footer appended thereto upon docketing in the CM/ECF system, not to the Affidavit's internal pagination, which begins after a cover page bearing the label "Exhibit A" (Docket Entry 111-1 at 1).

[17] "Section 1746 permits an unsworn declaration made under penalty of perjury to substitute for a sworn affidavit, but only if the claimant states that its contents are true and correct. There is no such language here." Sterling Fifth Assocs. v.

(continued...)

55

those filings "does not comply with the minimum requirements for an affidavit or declaration under [Section] 1746 and, therefore, provides no basis for relief." United States v. Tillman, No. 1:16CR17, 2019 WL 6327814, at *5 (N.D. Ohio Nov. 26, 2019) (unpublished) (denying ineffective assistance claims); see also Zuniga v. United States, Nos. 1:08CR366-2, 1:12CV304, 2015 WL 13567710, at *1 (M.D.N.C. Jan. 12, 2015) (unpublished) (Webster, M.J.) ("The burden is on the petitioner to establish his claim to relief [under Section 2255] by a preponderance of the evidence." (citing Miller v. United States, 261 F.2d 546, 547 (4th Cir. 1958))), recommendation adopted, 2015 WL 13567460 (M.D.N.C. Feb. 25, 2015) (unpublished) (Beaty, S.J.); Aiken v. United States, 191 F. Supp. 43, 49-50 (M.D.N.C.) (Stanley, J.) ("Unquestionably, the burden is on the defendant to prove by a preponderance of the evidence that he has been deprived of some constitutional right in connection with his guilty pleas which resulted in the judgment sought to be vacated, and that he must prove facts which would entitle him to the relief sought."), aff'd, 296 F.2d 604 (4th Cir. 1961).

---

[17](...continued)
Carpentile Corp., Inc., No. 03CV6569, 2003 WL 22227960, at *5 (S.D.N.Y. Sept. 26, 2003) (unpublished) (emphasis added) (internal footnote and citation omitted); accord, e.g., Nissho-Iwai Am. Corp. v. Kline, 845 F.2d 1300, 1306 (5th Cir. 1988).

56

Second, the Court should dismiss as "wholly incredible," Denton v. Hernandez, 504 U.S. 25, 33 (1992), Petitioner's unsworn and unverified allegations that Mr. Dusenbury – despite his vast experience (as noted by Judge Osteen in the exchange documented in the Introduction) – failed to understand and/or to accurately communicate to Petitioner the sentencing ranges established by the Section 924(c)-Career Offender guideline, U.S.S.G. § 4B1.1(c)(1) & (3) (2011),[18] which any federal criminal practitioner (to say nothing of attorneys with the decades of experience possessed by Mr. Dusenbury) knows vary by what (if any) reduction for acceptance of responsibility under U.S.S.G. § 3E1.1 applies, see U.S.S.G. § 4B1.1(c)(3) (providing for prison terms of "360-life," "292-365," and "262-327," for "No reduction," "2-level reduction," and "3-level reduction" under Section 3E1.1, respectively). The dismissal of those facially defective allegations, in turn, makes any aspect of Ground Two reliant on them "factually frivolous," Denton, 504 U.S. at 33, and thereby subject to summary denial, see, e.g, United States v. Butt, 731 F.2d 75, 77 (1st Cir. 1984) ("A § 2255 motion which is facially inadequate may be summarily denied, i.e., [courts

_____

[18] All citations to guideline provisions hereinafter refer to the 2011 Guidelines Manual.

Case 1:12-cr-00117-CCE   Document 152   Filed 02/27/23   Page 57 of 75

may deny claims] stating . . . contentions which are wholly incredible . . . ." (internal quotation marks omitted)).

A comparison of Petitioner's post-conviction allegations about these matters to the record (including his colloquy with Judge Tilley on May 14, 2012) underscores the frivolousness of this part of Ground Two. More particularly, in elaborating on Ground Two, the Memorandum alleges that Mr. Dusenbury's mis-advice about the imprisonment ranges prescribed by the Section 924(c)-Career Offender guideline came in the context of "[t]he government . . . ma[king] a plea offer to [Petitioner] through Mr. Dusenberry [sic]. That offer consisted of [Petitioner] pleading guilty to Count 2 . . . and [the] dismiss[al of] Count 1 . . . ." (Docket Entry 111 at 32.) According to Petitioner, that offer took the form of a _written_ plea agreement, which he kept. (See _id._ ("The offer went on to explain the statutory consequences as they related to entering a plea of guilt as to Count 2. Specifically, the plea agreement outlined the mandatory minimum as being (7) [s]even years, with a maximum of life. The plea agreement also contained a provision wherein the government would recommend a total 3-point decrease pursuant to U.S.S.G. § 3E1.1(a) [and] (b)." (spaces added) (parenthetical citation and stray comma omitted) (citing Docket Entry 111-1)); Docket Entry 111-1 at 3 ("I asked [Mr. McClellan] why he did not

58

. . . assist me in securing the [C]ount 2 plea offer. He told me he never knew about . . . it. I produced the written offer and showed it to him.").) Petitioner allegedly "told [Mr. Dusenbury Petitioner] wanted to accept that offer" (Docket Entry 111-1 at 2); however, "[Mr. Dusenbury] then told [Petitioner] that if [he] accepted the offer[ he] would get 30 years at a minimum and up to life . . . . [Mr. Dusenbury] also told [Petitioner he] had only the weekend to decide." (Id. at 2-3.)

In contrast, at the status conference on <u>Monday</u>, May 14, 2012, Petitioner said that "[he had] <u>never</u> seen a plea <u>in writing</u>" (Docket Entry 151 at 5 (emphasis added)), and that he and Mr. Dusenbury had <u>not</u> even discussed a guilty plea to Count Two (much less that the United States had offered such a disposition and/or that Petitioner wanted to accept any such offer), but instead that "[they] talked about <u>if</u> [Petitioner] would plead . . . to the Hobbs Act robbery charge and <u>try to get the gun [charge] dismissed</u>" (<u>id.</u> (emphasis added)). Furthermore (as detailed in the Introduction), far from expressing any interest in pleading guilty (to any charge, let alone Count Two), Petitioner used that status conference to complain about (A) Mr. Dusenbury allegedly making remarks to a federal agent inconsistent with Petitioner's innocence (<u>see</u> <u>id.</u> at 6), (B) Mr. Dusenbury failing to "put[] forth the effort to . . . <u>try</u>

59

[Petitioner's] case" (id. (emphasis added)), and (C) Mr. Dusenbury encouraging Petitioner to accept responsibility for the charges against him (see id. at 9). Consistent with those powerful indicators that, in his dealings with Mr. Dusenbury, Petitioner maintained his innocence and manifested an intent to proceed to trial, the record reflects that, when Mr. Dusenbury met with Petitioner immediately "following the status conference [on May 14, 2012]" (Docket Entry 12 at 2) and "during the evening of May 15, 2012" (id.), "[Petitioner] disclosed to [Mr. Dusenbury] the identity of a potential alibi witness" (id.). Finally, after "[a]ttempts to reach the potential witness . . . were unsuccessful" (id.) and "[Mr. Dusenbury] learned, on Tuesday, May 15, 2012, that the starting date for the trial in this case had been moved . . . [to Monday,] May 21, 2012" (id.), "[Mr. Dusenbury] informed [Petitioner of those developments]" (id.), whereupon "communication between [them became] . . . impaired to the point where [Petitioner wa]s unwilling to accept advice and counsel from [Mr. Dusenbury]" (id. at 3; see also id. at 3-4 (seeking "leave to withdraw from further representation of [Petitioner]").)

Petitioner's own (contemporaneous) words thus demonstrate that, at the time of the status conference on Monday, May 14, 2012, he had not received a written plea offer of any sort (much

less one which would have resolved this case with a guilty plea to Count Two and a recommendation of a three-level reduction for acceptance of responsibility) and Mr. Dusenbury's guideline forecast had not dissuaded Petitioner from his otherwise strong desire to plead guilty (rather Petitioner had faulted Mr. Dusenbury for insufficient commitment to Petitioner's vindication at trial). The record further confirms that, as of Tuesday, May 15, 2012, (A) Petitioner had re-affirmed his insistence on his innocence by identifying an alibi witness, (B) Mr. Dusenbury had focused his efforts on trying to track that witness down in advance of the (accelerated) trial date of Monday, May 21, 2012, and (C) Petitioner had ended all cooperation with Mr. Dusenbury. That sequence of events leaves no plausible point(s) at which:

1) Mr. Dusenbury would have brought Petitioner a written plea agreement calling for a guilty plea to Count Two and recommending a three-point, acceptance-of-responsibility reduction, with "only the weekend to decide" (Docket Entry 111-1 at 3);

2) Petitioner would have "told [Mr. Dusenbury that Petitioner] wanted to accept that offer" (id. at 2); and/or

3) Mr. Dusenbury would have caused Petitioner to reject that offer by (inexplicably) failing to differentiate the prison

61

terms applicable under the Section 924(c)-Career Offender guideline with or without a three-level, acceptance-of-responsibility reduction, by telling Petitioner "that if he accepted the offer[ he] would get 30 years at a minimum and up to life" (id. at 2-3).[19]

_____

[19] Notably, Mr. Dusenbury would have had to tender any such written plea agreement to Petitioner sometime after the status conference on May 14, 2012, and before their communication breakdown on May 15, 2012, at which moment (i.e., on a Monday or a Tuesday) it would have made no sense for Mr. Dusenbury to describe the time allotted to Petitioner for consideration of that plea agreement as "only the weekend" (Docket Entry 111-1 at 3); to the contrary, such a temporal description only would have fit a time-line (not possible here) where Mr. Dusenbury conveyed the plea agreement to Petitioner during (or shortly before) a weekend, not at or near the start of the week (the only possibility here), when a very different time-limiting phrase – e.g., "through the weekend" – instead would have fit the chronology. Petitioner's Affidavit suffers from another (even more glaring) time-order conflict on this front, in that it states first that (A) "[Petitioner] told [Mr. Dusenbury that Petitioner] wanted to accept th[e Count Two plea] offer" (id. at 2), (B) "[Mr. Dusenbury] then told [Petitioner] that if [he] accepted the offer[ he] would get 30 years at a minimum and up to life, because [he] was a career offender" (id. at 2-3), and (C) "[a]fter this, Mr. Dusenbury was removed from [Petitioner's] case and [Petitioner] started doing [his] own legal research, which led [him] to believe that [he] was not a career offender" (id. at 3), but then (inconsistently) states: "When [Mr.] Dusenbury represented [Petitioner], [Petitioner] had no idea initially why [Mr. Dusenbury] was saying 30 years to life. Eventually, [Petitioner] learned [Mr. Dusenbury] was wrong about the career offender status and [Petitioner] explained this to [Mr. Dusenbury], but [Mr. Dusenbury] argued against [Petitioner] with erroneous legal arguments." (Id. at 4.) In the first account, Petitioner formed his belief about the career offender issue only after Mr. Dusenbury withdrew, whereas (in the second account) Petitioner formed his belief about the career offender issue before Mr. Dusenbury withdrew. "What [these (continued...)

62

The remaining ineffectiveness allegations against Mr. McClellan fare no better. In that vein, Petitioner has alleged:

1) "[u]pon their first meeting[, P]etitioner explained to [Mr. McClellan] that [Petitioner] wanted to plead guilty to limit his sentencing exposure" (Docket Entry 111 at 34; <u>see also</u> Docket Entry 111-1 at 3 ("I explained to [Mr. McClellan] that I wanted to plead guilty . . . ."));

2) "[a]s part of th[at] conversation[, Petitioner] asked if there were any offers made, to which [Mr.] McClellan stated that the only offer was to both counts for a total term of 30 years imprisonment" (Docket Entry 111 at 34 (citing "Exhibit B"); <u>see also</u> Docket Entry 111-1 at 3 ("[I] asked [Mr. McClellan] if there were any offers. [H]e told me the only offer was to both counts for 30 years."); Docket Entry 111-2 at 1 (cover page labeled "Exhibit B"), 2-43 (copy of Petitioner's initial sentencing hearing transcript, which also appears as Docket Entry 79, but with all even-numbered pages reproduced twice));

<hr>

[19](...continued)
discrepancies] prove . . . [i]s that [Petitioner] has a propensity for lying and has trouble keeping his lies straight." <u>SDC Sols., Inc. v. Amcom Software, Inc.</u>, No. 08CV89, 2008 WL 11510371, at *2 (D.N.H. June 26, 2008) (unpublished), <u>recommendation adopted</u>, 2008 WL 11510372 (D.N.H. July 21, 2008) (unpublished).

3) "[t]he case proceeded to trial wherein [Petitioner] was eventually convicted of both counts and sentenced to a term of 360 months [in prison]" (Docket Entry 111 at 34);

4) "[p]rior to sentencing, [Mr. McClellan] and [P]etitioner went over the PSR where [Petitioner] again explained to M[r]. McClellan that [Petitioner] was in fact not a career offender" (id. (periods omitted from "PSR"));[20]

5) "[Mr. McClellan] agreed that he believed [Petitioner's] argument seemed to be correct" (id.; see also Docket Entry 111-1 at 3 ("When the [PSR] came back, I explained to Mr. McClellan that I was not a career offender and he seemed to agree with me."));

6) "[t]his prompted [P]etitioner to ask [Mr. McClellan] . . . why did he not relay the plea offer that could have resulted in a 7 year term" (Docket Entry 111 at 34 (citing "Exhibit B"); see also Docket Entry 111-1 at 3 ("I asked [Mr. McClellan] why he did not . . . assist me in securing the [C]ount 2 plea offer."));

_____

[20] Despite the above-quotation's use of the word "again" (Docket Entry 111 at 34), the Memorandum's review of Petitioner's alleged interactions with Mr. McClellan does not relate any earlier instance in which Petitioner "explained to M[r]. McClellan that [Petitioner] was in fact not a career offender" (id.). (See id. at 33-37 (discussion under subheading "Attorney McClellan" (emphasis omitted)); see also Docket Entry 111-1 at 3 (describing only single conversation between Petitioner and Mr. McClellan about career offender issue).)

64

7) "[Mr. McClellan] told [P]etitioner [that Mr. McClellan] never relayed the plea ot [sic] attempted to negotiate the plea because he never seen [sic] it" (Docket Entry 111 at 34; <u>see also</u> Docket Entry 111-1 at 3 ("[Mr. McClellan] told me he never knew about the plea or even seen [sic] it.")); and

8) "[Petitioner] produced the plea to which [Mr.] McClellan responded he never saw the offer, and when he relayed the 30 year plea to two separate counts he was going off what [Mr.] Dusenbury had relayed" (Docket Entry 111 at 34 (citing "Exhibit B"); <u>see also</u> <u>id.</u> ("A thorough investigation into the file would have revealed this offer."); Docket Entry 111-1 at 3 ("I produced the written offer and showed it to [Mr. McClellan]. He told me the only reason he told me there was a 30 year plea to both counts was because he was going off of what [Mr.] Dusenbury told him." (internal paragraph number omitted))).

Based on those allegations, the Memorandum distills this litany of purported deficient performance by Mr. McClellan:

> Here, we have an attorney who (1) never relayed the correct offer, (2) relayed an offer that was never made - plead to two[ ]counts for a thirty year term of imprisonment, (3) failed to review the file and discover the plea offer and relay the correct peremiters [sic] of the plea, (4) gave faulty legal advice relating to the sentencing exposure if Petitioner entered into a plea, and (5) gave Petitioner no legal advice as to whether or not to plead or accept the offer, as a result of his failure to even become aware of the actual offer that was out there.

65

(Docket Entry 111 at 34-35.) The record, however, actually lacks any competent evidence that (A) the United States ever made any concrete plea offer to Petitioner (particularly during Mr. McClellan's service as Petitioner's counsel), (B) Mr. McClellan ever said the United States made a plea offer with a 30-year prison term (or, if he did, that the United States had not, in fact, made such an offer), (C) any file available to Mr. McClellan contained any written plea offer by the United States, (D) Mr. McClellan gave Petitioner any unreasonable advice about his sentencing exposure if he pleaded guilty, and (E) any plea offer existed about which Mr. McClellan could have learned and could have advised Petitioner.

Petitioner's failure of proof on these points arises most obviously from the fact (documented previously) that he neither swore to his Memorandum and his Affidavit nor complied with Section 1746 in signing them. See Tillman, 2019 WL 6327814, at *5 (denying ineffectiveness claims where the petitioner's filings "d[id] not comply with the minimum requirements for an affidavit or declaration under [Section] 1746 and, therefore, provide[d] no basis for relief"); see also Zuniga, 2015 WL 13567710, at *1 (citing Fourth Circuit authority recognizing that "burden" of proof in Section 2255 actions falls "on the petitioner"). In addition, even if properly sworn or verified,

66

the above-quoted portions of the Memorandum and Affidavit on which Petitioner relies in charging Mr. McClellan with professional malpractice do not reflect the requisite personal knowledge for many of the matters alleged (such as the existence of a concrete plea offer from the United States while Mr. McClellan represented Petitioner, the non-existence of a plea offer requiring a guilty plea to both Counts One and Two as well as a 30-year prison term, and/or the existence of a file which Mr. McClellan could have reviewed and in which he would have found a still-available, written plea offer). See, e.g., United States v. Carter, No. 3:07CR230, 2013 WL 394717, at *2 (E.D. Va. Jan. 31, 2013) (unpublished) (emphasizing, in Section 2255 action, that "facts offered by affidavit or sworn declaration . . . must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated" (internal quotation marks omitted)).

Any of Petitioner's foregoing allegations about Mr. McClellan which conceivably could bespeak personal knowledge still founder on Strickland's first prong, because (like Petitioner's frivolous attacks on Mr. Dusenbury) they reek of the "wholly incredible," Denton, 504 U.S. at 33, i.e., they "don't pass the smell test; any common sense review would compel

dismissal of such assertions without pause," <u>Elizabethtown Gas</u>
<u>Co. v. National Lab. Rels. Bd.</u>, 212 F.3d 257, 268 (4th Cir.
2000) (internal quotation marks omitted). As a result, the
Court should deny Petitioner's ineffectiveness claim(s) against
Mr. McClellan in Ground Two founded on such allegations as
"factually frivolous," <u>Denton</u>, 504 U.S. at 33; <u>see also</u> <u>Butt</u>,
731 F.2d at 77 (approving summary denial of habeas claims
dependent on "whole incredible" allegations (internal quotation
marks omitted)). To hit some highlights:

1) at several intervals, the Memorandum's elaboration on
Ground Two cites to "Exhibit B" for support (<u>see</u> Docket Entry
111 at 34), but "Exhibit B" consists solely of a copy of
Petitioner's initial sentencing hearing transcript, which does
not substantiate any allegation of deficient performance
proffered against Mr. McClellan (<u>see</u> Docket Entry 111-2 at 1-
43);

2) on multiple occasions throughout Mr. McClellan's
representation of Petitioner, Judge Tilley lauded Mr. McClellan
for his diligence and attention to detail, traits totally
incompatible with Petitioner's instant allegations of neglect
and ineptitude on Mr. McClellan's part (<u>see</u> Docket Entry 58 at
48 ("[Petitioner], as you heard me recite earlier today, [Mr.
McClellan] is [as] thorough and careful a lawyer as I have come

68

into court."); Docket Entry 150 at 8 (denying Petitioner's request to discharge Mr. McClellan and commenting: "Mr. McClellan is as thorough as any lawyer who appears in this [C]ourt. He has been doing it for years, and I've watched him doing it for years, and nobody crosses more T's or dots more I's than he does in getting ready for a trial."));

3) in a letter Petitioner chose to submit to the Court, Mr. McClellan confirmed that, during "the course of [his] representation of [Petitioner], [Mr. McClellan could ]not recall any time in which [Petitioner] said [he] w[as] willing to accept a plea" (Docket Entry 143-1 at 3), and "certainly there was no discussion of a [plea to a] '30 year sentence'" (id.; see also id. ("[T]here were no serious discussions about a plea entry on your behalf, nor were there any discussions at any time for a plea for a certain number of years or months."));

4) if (as he has alleged) Petitioner actually possessed a copy of a written plea agreement providing for his guilty plea to Count Two, dismissal of Count One, and a recommendation of a three-level reduction under Section 3E1.1, and he actually wanted to accept that offer (see Docket Entry 111 at 34; Docket Entry 111-1 at 3), Petitioner could – at any time, including when Mr. McClellan supposedly said that the only offer from the United States required a guilty plea to both Counts One and Two,

69

along with a 30-year prison sentence (see id.) – simply have signed that plea agreement and directed Mr. McClellan to tender it to the United States Attorney's Office, instead of waiting until after the jury returned its guilty verdict on Counts One and Two to confront Mr. McClellan with that plea agreement, as allegedly transpired (see id.); and

5) as laid out more fulsomely in the Introduction, Petitioner persistently trumpeted his innocence while represented by Mr. McClellan (see, e.g., Docket Entry 14 at 1 (noting in order permitting Mr. Dusenbury's withdrawal that Petitioner "assert[ed that] various matters requir[ed] investigation by his [new] counsel, including a potential alibi witness"); Docket Entry 27 at 1 ("assert[ing] a defense of alibi"); Docket Entry 32 at 2 (invoking, in pro se filing, "protected right to a jury trial"); Docket Entry 38 at 1 (declaring, in pro se filing, that "the prosecutor has no evidence what-so-ever to prove Count 2"); Docket Entry 59 at 168-96 (presenting alibi evidence at trial); Docket Entry 63 at 1 ("[Petitioner] contends that he is innocent of the offenses to [sic] which he is charged, and as [sic] of the jury's verdict, and maintains his innocence regarding the events surrounding the robbery of [the p]izza store that occurred on or about March 26 and 27, 2011."); Docket Entry 79 at 11 ("[Petitioner] has pled

not guilty and maintains his innocence . . . ."); Docket Entry
117 at 20 (reciting in PSR addendum that "[Petitioner] denies
being involved in the instant offense[s]")); see also Docket
Entry 103 at 40 ("I am concerned with [Petitioner] knowingly
presenting evidence to deceive the jury, that does not make me
believe somebody has turned a new leaf and really wants to be
remorseful or admit conduct, it is just the very opposite of
that."); Docket Entry 143-1 at 2-3 ("I can remind you that you
took the position that you were not guilty of all offenses and
you did not wish to take any plea under any circumstance.  You,
in particular, indicated you had an alibi witness . . . .  [Y]ou
always took the position with me that you were not guilty of the
offense.  Furthermore, you took the position that you wanted to
have the alibi witness testify in your behalf . . . .")).[21]

_____

[21]   Petitioner's only (ambiguous) deviation from his
otherwise uniform pattern of protesting his innocence came
around the time of the initial disclosure of the PSR, when (as
set forth in the Introduction) he made several pro se filings
complaining about Mr. Dusenbury's and Mr. McClellan's handling
of the plea bargaining process.  (See Docket Entry 48 at 1-2;
Docket Entry 55 at 1; Docket Entry 57 at 2.)  However, as also
recounted (at length) in the Introduction, Petitioner
effectively abandoned those complaints when he appeared at a
status conference on October 25, 2012, despite receiving every
opportunity from Judge Tilley to articulate them.  (See Docket
Entry 150 at 2-8.)  Moreover, in the filings in question,
Petitioner never affirmatively admitted that he committed the
offense conduct charged in the Indictment.  (See Docket Entry 48
at 1-2; Docket Entry 55 at 1; Docket Entry 57 at 2.)

To sum up, the record does not permit a finding by a preponderance of the evidence that Mr. Dusenbury or Mr. McClellan performed deficiently, as Grounds Two and Three allege. Alternatively, even if the Court concluded that Mr. Dusenbury or Mr. McClellan provided inadequate plea-related representation, the record still forecloses collateral relief, because Petitioner cannot establish prejudice. In this context:

> To show prejudice from ineffective assistance of counsel where a plea offer has . . . been rejected because of counsel's deficient performance, defendants must demonstrate a reasonable probability they would have accepted the earlier plea offer had they been afforded effective assistance of counsel. Defendants must also demonstrate a reasonable probability the plea would have been entered without the prosecution canceling it or the trial court refusing to accept it . . . .

Missouri v. Frye, 566 U.S. 134, 147 (2012).

Petitioner cannot show any such prejudice, because the record confirms <u>not only</u> that he maintained his innocence over the life of his criminal case (in the manner detailed in the Introduction and discussed above), <u>but also</u> that he conspicuously omitted from his post-conviction filings addressing Grounds Two and Three <u>any admission of guilt</u> to the charges in the Indictment (<u>see</u> Docket Entry 110, ¶ 12.B. & C. (referring to Memorandum for "[s]upporting facts"); Docket Entry 111 at 28-44 (discussing Grounds Two and Three); Docket Entry 111-1 at 2-3 (making allegations pertinent to Grounds Two and

72

Three); Docket Entry 138 at 1-4 (discussing Grounds Two and Three)). See, e.g., United States v. Ohia, Crim. No. 13-139, 2017 WL 1088081, at *6 (M.D. La. Mar. 22, 2017) (unpublished) (ruling that the petitioner could not satisfy Frye standard where "[he] ha[d] never admitted his guilt; rather, he maintained his innocence even throughout his sentencing hearing" and where he offered "no evidence that [he ever] demonstrated any intent to plead guilty"); Mann v. United States, 66 F. Supp. 3d 728, 740-41 (E.D. Va. 2014) ("[The] petitioner's steadfast adherence to his not guilty plea . . . flatly contradicts his assertion that he would have accepted the government's [] plea offer."); United States v. Taylor, Nos. 1:06CR23, 1:12CV303, 2013 WL 2470259, at *6 (N.D. Ind. June 7, 2013) (unpublished) ("[The petitioner] presents no evidence that he was willing to accept responsibility for the criminal offense at the time he proceeded to trial. At trial, his defense was that he was in Fort Wayne to visit family, not to rob a stash house. Even at the time of sentencing, when the [petitioner] was placing his objections to the PSR on the record, he continued to maintain his innocence. . . . [T]here is nothing in the record to suggest that the [petitioner] would have accepted a plea agreement absent advice he received from his attorney."); Body v. United States, Crim. No. 10-232, Civ. No. 12-483, 2013 WL

2470660, at *25 n.49 (S.D. Ala. June 6, 2013) (unpublished)
("[The] petitioner has not established prejudice. . . . Given
[his] consistent and unrelenting position that he is and has
always been actually innocent . . ., his conclusory allegations
that he would have pled guilty . . . are as opportunistic as
they are unbelievable."), aff'd, 568 F. App'x 760 (11th Cir.
2014).

     At best (for Petitioner), "this is a situation where [he],
in hindsight, now wishes to revive and accept [a prior] plea
offer he received.  This falls far short of showing prejudice
under *Strickland*."  Mann, 66 F. Supp. 3d at 741.  Accordingly,
Petitioner has not carried his burden on Strickland's prejudice
prong, i.e., he has "demonstrate[d neither] a reasonable
probability [he] would have accepted the earlier plea offer,"
Frye, 566 U.S. at 147, nor "a reasonable probability the plea
would have been entered without the prosecution canceling it or

th[is C]ourt refusing to accept it," id.[22]  Grounds Two and Three fail on that basis as well.

CONCLUSION

Petitioner has not shown entitlement to collateral relief.

**IT IS THEREFORE RECOMMENDED** that the Section 2255 Motion (Docket Entry 110) and the Motions to Amend (Docket Entries 120, 128) be denied, without a certificate of appealability.

/s/ L. Patrick Auld
**L. Patrick Auld**
**United States Magistrate Judge**

February 24, 2023

---

[22] Petitioner also cannot show that, if convicted solely on Count Two, "the end result of the criminal process would have been more favorable by reason . . . of less prison time," Frye, 566 U.S. at 147, as – contrary to his assertion that "the [C]ourt found that an 84 month sentence was sufficient but not greater than necessary to achieve the goals of sentencing" (Docket Entry 111 at 40) – Judge Tilley made clear at the resentencing hearing that only the total prison term of 199 months imposed on Petitioner (after an upward departure) adequately accounted for the considerations set forth in Section 3553(a) (see Docket Entry 103 at 40-41).